586 So.2d 371 (1991)
Julia NOE, Appellant,
v.
STATE of Florida, Appellee.
No. 90-111.
District Court of Appeal of Florida, First District.
August 7, 1991.
Rehearing Denied October 25, 1991.
*372 Gwendolyn Spivey, Sp. Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Carolyn J. Mosley, Asst. Atty. Gen., Tallahassee, for appellee.
JOANOS, Chief Judge.
Appellant Julia Noe appeals her conviction and sentences after a jury found her guilty of first degree murder and aggravated child abuse. The trial court imposed a life sentence for the murder conviction, in accordance with the jury's recommendation. In addition, a separate consecutive *373 fifteen-year sentence was imposed for the aggravated child abuse conviction. The issues for our review are: (1) the denial of defense challenges for cause to three prospective jurors, (2) the denial of appellant's motion for change of venue, (3) the denial of appellant's motion to suppress statements, and (4) imposition of a sentence in excess of the sentencing guidelines without simultaneous written reasons. We reverse and remand for new trial with regard to the first issue; we affirm as to the second and third issues, and do not address the last.
Appellant was convicted of the death of her three-year old son, Jonathan English. On March 10, 1989, the day of the child's death, appellant was engaged in tasks related to her family's recent move. The family consisted of appellant, her husband Jeff Noe, her baby son Daniel, and Jonathan, appellant's son by a previous marriage. Other than appellant, the last person to see Jonathan alive was a passing neighbor, who observed him playing in the yard about 12:15 p.m. At 8:00 p.m., appellant asked another neighbor if he had seen Jonathan. The neighbor responded negatively, but suggested that the child might be playing with his children at the Marshall home. The neighbor observed appellant walk to the fence, where she paused briefly and appeared to listen, and then returned to her own home.
The record reflects that appellant made no further effort to look for Jonathan until 7:30 p.m., when her husband returned from work. Jeff Noe enlisted the assistance of neighbors, and began a search for the child. At 9:15 p.m., the child was reported as missing to the Wakulla County Sheriff's Department. By the time a deputy sheriff arrived at the scene, the child had been discovered dead in the septic tank in the yard of the Noes' rented trailer.
The news of the child's death spread through the community. Neighbors who had aided in the search were joined by others who learned that the child had been found dead. The initial investigation involved photographing the area and interviewing persons who had gathered at the scene. Appellant and her husband were asked to go to the sheriff's office to be interviewed there. Appellant was transported by Major Langston, of the Wakulla County Sheriff's Department, while Jeff Noe was transported by Sheriff Harvey and Investigator Gandy.
Upon arrival at the Sheriff's Department, appellant was taken to Major Langston's office, where she was questioned by Major Langston and Investigator Gandy. The evidence is conflicting as to whether appellant asked to have her husband with her. At the suppression hearing, appellant testified that she asked the officers to permit her to talk with her husband before they started questioning her, but they did not do so. The officers stated that appellant made no such request. A similar conflict exists with regard to appellant's right to refuse to accompany the officers to the Sheriff's Department, and her freedom of movement once she got there. Appellant acknowledged that she was not handcuffed or placed under any other overt physical restraint, but maintained that she did not feel free to refuse to accompany the officers and did not feel free to leave. During the questioning, appellant was granted a break to go to the restroom, but she was followed there by another woman, presumably a member of the sheriff's staff. The officers maintained that appellant was asked to go to the Sheriff's Department due to the confusion occasioned by the many people gathered at the Noe residence. The officers further insisted that appellant was not forced to accompany them, and that she was free to leave at any time. However, they acknowledged that no one advised appellant to that effect.
It is undisputed that appellant was not given Miranda[1] warnings prior to questioning, which began at 12:20 a.m. in Major Langston's office. The only persons present during the questioning were appellant, Major Langston, and Investigator Gandy. At 2:05 a.m., following a period when the officers' questions focused specifically on the septic tank, Investigator Gandy *374 advised appellant that "things just weren't adding up." At that point, appellant stated that Jonathan was "hyper," he cried all the time, he was screaming, and she "snapped." At 2:10 a.m., Investigator Gandy advised appellant of her rights. This was accomplished by providing appellant with a printed Miranda rights form, which, according to Gandy, she appeared to read, and by reading the rights to her. Appellant indicated to the officers that she would waive her rights, and talk to them. She then repeated her prior admission that she placed Jonathan in the septic tank.
Before taking appellant to the Sheriff's Department for questioning, the officers were in possession of the following information: (1) appellant had been home with the child all day; (2) seemingly she was the last person known to have seen the child alive; (3) she did not search for the child or advise anyone that he was missing, other than the one query to a neighbor at 3:00 p.m.; (4) she spent the afternoon unpacking and making preparations for dinner, as though nothing were amiss; (5) the septic tank lid was closed, i.e., it was not crooked or ajar in any way. In addition, at the time appellant was asked to accompany officers to the Sheriff's Department, the investigating team had concluded that the child's death was not accidental.
Mental health experts who examined appellant held conflicting views concerning her capacity to make a voluntary waiver of her rights when she confessed. Dr. Maher testified that at the time of her confession, appellant was in a state of psychic shock which made her passively compliant with the expectations and desires of the officers. In other words, the doctor felt that appellant lacked the ability to make independent judgments for herself. According to Dr. Maher, appellant's capacity to distinguish the circumstances of making a statement to the police before having been advised of her right to remain silent, versus her ability to make the comparison after having been advised of those rights, was totally absent. In a similar vein, Dr. Berland stated that appellant was incompetent to make a good judgment concerning whether she needed a lawyer, describing appellant as extremely irrational and a person who approaches the world from an unrealistic, fantasy-like point of view. A contra view was expressed by Dr. McClaren. He opined that appellant had the capacity to understand her rights when they were read to her, giving due consideration to the fact that she was in the midst of a traumatic experience in that her son was dead, and she was being accused of his murder. Dr. McClaren felt appellant's waiver was voluntary, although he offered the caveat that one would find it harder not to make a second statement after a statement already had been made, than if there had been no prior statement.
The crime which is the subject of this appeal received rather wide-spread publicity in the North Florida region where it occurred, both through regular news channels and by word-of-mouth. Four articles appeared in the Tallahassee Democrat, and four articles appeared in the Wakulla News. Five of the articles mentioned appellant's confession, one mentioned the retraction of her confession, and two articles mentioned appellant's alleged child abuse. One article described bloody streaks which the child clawed in his face as he drowned. Also, the crime was reported on television. Community knowledge of the crime and information concerning it became manifest during jury selection. Forty prospective jurors were excused on the basis of prejudicial exposure to pretrial publicity, actual knowledge of the case, or predetermined views concerning the defendant's guilt.
The first issue in this case is a reflection of the pretrial publicity. This issue concerns the denial of defense challenges for cause as to three prospective jurors: Mrs. Lessie Crum, Mr. Mark Roddenberry, and Mr. Clarke Eckert. Mrs. Crum was challenged on the ground that she had formed an opinion that appellant was guilty, based on the publicized confession, and that she was unable to state she could decide the case fairly, impartially, and objectively. The basis for challenge to this juror is demonstrated by the following portion of the voir dire examination of Mrs. Crum:

*375 THE COURT: When you and your husband discussed it, did ya'll come to any conclusions or opinions about the innocence or guilt of the person?
MRS. CRUM: Nothing except the fact of what it said, you know, that the lady had been questioned at the Sheriff's Department and on what she said, you know. That was the only thing that we drew our conclusions on, you know, on the fact what she said that she had done.
THE COURT: Okay. What did you conclude, if you drew a conclusion?
MRS. CRUM: At that time, you know, I'm sure that it was probably to the effect, you know, that if she said that she did it, that she was guilty.
THE COURT: Have you formed any opinion at this point about how you think the case ought to go?
MRS. CRUM: No, sir. I have been too nervous.
.....
THE COURT: Well, would you be able to sit in the jury and listen to the case and not let your prior knowledge of the case affect your independence to make a decision?
MRS. CRUM: I would certainly hope so.
.....
MR. HARVEY [Defense Counsel]: Okay. Do you think  is your state of mind such that you feel you can give Julia a fair trial, an impartial  be an impartial juror?
MRS. CRUM: I would do my best.
MR. HARVEY: Okay. Sometimes when people say that, "do my best," they have something in the back of their mind making them a little bit hesitant. Have you got anything that makes you hesitant about that?
MRS. CRUM: All I can do, sir, if I'm called to do this is just tell you that I'll do my best, you know.
.....
MR. HARVEY: ... Do you think you can keep the emotion part of it out of your decision?
.....
MRS. CRUM: I'll do my best.
MR. HARVEY: Okay. Is there a hesitation there that you would be able to do that?
MRS. CRUM: No, sir. I just can't sit here and tell you yes, I will. All I can promise you is that I will do my best. I have never been in this situation before. I don't know what I'm facing.
So, for me to sit here and tell you yes, I will do it, it's 
MR. HARVEY: It's a hard question.
MRS. CRUM: It's a hard question for me to answer. And I'm not sure if I said yes, I would be being honest.
MR. HARVEY: Okay.
MRS. CRUM: All I can say is I would do my best.
Defense counsel's challenges for cause as to juror Crum were denied, as were defense counsel's requests for additional peremptory challenges to remove this juror.
Appellant's theory of defense was not guilty by reason of insanity. Prospective jurors were examined specifically on their views concerning the insanity defense. The defense challenged prospective jurors Mark Roddenberry and Clarke Eckert for cause, based on their expressed reservations concerning the validity of insanity as a defense. Juror Roddenberry had read several newspaper articles about the case, including a reference to appellant's confession, and had heard various discussions of the case. In addition, Mr. Roddenberry was acquainted with Sheriff Harvey of Wakulla County, Investigator Gandy of the State Attorney's Office, and Sergeant Gunter of the Leon County Sheriff's Office. Portions of the voir dire examination of juror Roddenberry pertaining to the insanity defense follow:
MR. HANKINSON [Prosecutor]: ... Was there anything that we asked about, you know, legal principles, your philosophical beliefs, that you would have something different to say than what we have heard or the mainstream of what we have heard?
MR. RODDENBERRY: Mr. Hankinson, I have somewhat of a philosophical problem with the issue of insanity as a defense. I think I should tell you, as well *376 as Mr. Harvey, that I don't want to say anything that would prejudice anybody else; but I think sometimes that defense attorneys use that to try to get their clients off maybe when it's not warranted.
It also concerns me that expert witnesses can come into court and you get conflicting testimony on the issue of insanity.
MR. HANKINSON: Are your views so strong  I mean, the Judge is going to tell you what the definition of insanity is. And it's the jury's job to sift through that and see whether it's bona fide or whether it is a sham... .
Do you feel like your views are such that you can't follow the instructions the Judge gives you and go through that weighing process?
MR. RODDENBERRY: I feel like I could be as objective as anyone else on the jury.
MR. HANKINSON: And follow the law as the Judge gives you on that?
MR. RODDENBERRY: Yes.
MR. HANKINSON: It's going to be more detail than what I've said. But, I mean, essentially, you know, I expect he'll tell you that, one, somebody is mentally ill, and two, that it's to such an extent they totally don't understand the difference between right and wrong or don't understand what the consequence of what they are doing or words to that effect.
Do you have some problem with that legal standard?
MR. RODDENBERRY: No, I don't.
MR. HANKINSON: Okay. So, it's just in some applications you're concerned it's been abused?
MR. RODDENBERRY: Yes.
.....
MR. HARVEY [Defense Counsel]: ... On the insanity issue, I mean, you can understand why I'm concerned about that, too, because if you are not willing to listen to it, then that's what my defense is going to be, you know.
Now I understand your concerns and that's what I have been asking. That's why I have been wanting to know. But, you know, on the other flipside of that, do you think that nobody is legally insane?
MR. RODDENBERRY: I didn't mean to imply that, Mr. Harvey.
MR. HARVEY: Okay.
MR. RODDENBERRY: I understand that you have to raise or if you raise the doubt, then it's up to Mr. Hankinson to prove that she was sane. I mean, you are going to have to work pretty hard.
MR. HARVEY: To raise the doubt?
MR. RODDENBERRY: You have got to show me. I mean, if you show me. I don't want to imply that I'm not willing to listen. I think I'll be willing to listen to anyone.
.....
THE COURT: Mr. Roddenberry, let me ask you a question on your comments on the defense of insanity. You are not outright rejecting the philosophy that insanity is a valid defense; are you?
MR. RODDENBERRY: No, sir; I'm not.
THE COURT: Are you telling me then that insanity as a defense may be valid in some cases and some cases it's not?
MR. RODDENBERRY: I have a problem, Judge, with the fact that someone can be found not guilty by reason of insanity. I mean, if a crime has been committed and they're guilty, I think that insanity should be a mitigating factor in the sentencing as opposed to just the slate, so to speak, wiped clean.
THE COURT: Well, you understand it doesn't wipe it clean. There are other 
MR. RODDENBERRY: Be found not guilty, they're not guilty.
THE COURT: But you're saying that you have little faith in the defense of insanity?
MR. RODDENBERRY: Well, as I mentioned while ago, I have a problem with experts that don't seem to be able to agree when someone is sane or not insane.
THE COURT: Well, there are experts in every field who disagree.
MR. RODDENBERRY: I understand.

*377 THE COURT: Any more questions, Mr. Hankinson?
MR. HANKINSON: Let me clarify on that. I guess what you are saying, if I understand you, you have got some philosophical questions there. But are you willing to follow the law the Judge gives you?
MR. RODDENBERRY: Yes; I thought I made that clear, Mr. Hankinson.
MR. HANKINSON: I wasn't sure whether you were saying something different now.
MR. RODDENBERRY: No, I'm not.
.....
MR. HARVEY: Judge, can I inquire a little further?
As I am understanding what you are saying, are you skeptical that this type of defense is overused by lawyers? Is that what you are saying?
MR. RODDENBERRY: Yes, I am.
MR. HARVEY: I guess you are kind of skeptical about it coming into the case with me and my client, just the idea of it coming in?
MR. RODDENBERRY: Well, as I said initially, I have some concerns about it, but I'm willing to listen to the facts. I want to make that clear. And I'll be objective.
The trial court denied the defense challenge for cause as to Mr. Roddenberry, and subsequently denied a renewed challenge for cause as well as the defense request for additional peremptory challenges to strike this juror.
The voir dire examination of juror Eckert revealed much the same skepticism concerning the insanity defense, as demonstrated by the following excerpt:
MR. HANKINSON: What about insanity? Do you have any thoughts on that?
MR. ECKERT: Only to the extent that we are not armed with the one more tool that we need, which would be guilty but insane. And I don't believe we are in this State able to use that.
MR. HANKINSON: Okay.
MR. ECKERT: Because I feel that if a person is insane, that doesn't necessarily mean that she shouldn't be punished for it.
.....
MR. HARVEY: ... Do you feel the way Mr. Roddenberry does that you're skeptical about the use of the defense or you just don't like the way it's written in the statute?
MR. ECKERT: It's a difficult question to answer. I know that there are people that are insane and probably should be judged insane. But I also feel that some of the people that are judged insane should not be allowed in six months to be judged sane and be released back into society.
MR. HARVEY: I don't think anybody disagrees with that. I mean, I think you're right. The question in the case is you're going to be the judge of whether what I show you puts in your mind the reasonable doubt that she's insane. You're going to be the judge on whether I am able to do that. Okay.
Have you got a problem with, you know, just in general, me using that defense?
MR. ECKERT: If you or your witnesses can prove she is insane to my satisfaction, she will receive that judgment from me.
MR. HARVEY: You know, we're going to get into a semantics game here, I guess. But the Judge will tell you what the law is. Okay. And my question is going to be whether, you know, whether you are able to follow that law. But he basically is going to say  he's not going to tell you that I have to prove that she is insane.
He is going to tell you that I have to prove enough to raise a reasonable doubt in your mind. Okay. And you're the only one that can say whether it's a reasonable doubt in your mind; is it going to make sense to you.
And if I do that, see, then the State has got to prove that she is sane. See what I mean?
MR. ECKERT: I realize there is a reverse in this position.
MR. HARVEY: Right. And they have got to come back and prove that she is *378 sane. You know, you may be left at the end with a question mark in your mind.
MR. ECKERT: Everybody here may be.
MR. HARVEY: That's exactly right. And I think the law is going  that the Judge is going to tell you if you have a reasonable doubt at the end, if he hasn't proven that she's sane, and you have still got a question mark in your mind, that you are going to have to come back with this verdict that evidently you don't like, which is not guilty by reason of insanity. Now, I mean, you know, can you do that?
MR. ECKERT: I believe I can.
At the conclusion of the questioning of Mr. Eckert, defense counsel renewed the challenges for cause to Mrs. Crum and Mr. Roddenberry, and requested two additional peremptory challenges to remove these jurors. In addition, co-defense counsel requested an additional peremptory challenge to remove Mr. Eckert. The defense challenges for cause and for additional peremptories again were denied.
At the outset, the parties to this appeal agree as to the rules applicable to excusing a juror for cause. The well established and much-quoted rule was stated thusly in Singer v. State, 109 So.2d 7, 23-24 (Fla. 1959):
... if there is basis for any reasonable doubt as to any juror's possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence submitted and the law announced at the trial he should be excused on motion of a party, or by the court on its own motion.
In application of the rule, the following guidelines should be considered: (1) a juror's statement that he would render a verdict according to the evidence is not sufficient of itself to overcome what he has said about forming an opinion; (2) every juror should come to the investigation of a case free from any preconceived impression of it; (3) if there is doubt as to the juror's sense of fairness or his mental integrity, he should be excused; (4) a juror who has asserted views of bias and prejudice cannot be considered free of such merely because, under skillful questioning, he declares himself free of its influence. Singer, 109 So.2d at 22-24. "Close cases involving challenge to the impartiality of potential jurors should be resolved in favor of excusing the juror rather than leaving doubt as to his or her impartiality." Phillips v. State, 572 So.2d 16 (Fla. 4th DCA 1990). See also Sydleman v. Benson, 463 So.2d 533 (Fla. 4th DCA 1985).
The Singer principles were reaffirmed in Moore v. State, 525 So.2d 870 (Fla. 1988); Hill v. State, 477 So.2d 553 (Fla. 1985); State v. Williams, 465 So.2d 1229 (Fla. 1985); Tenon v. State, 545 So.2d 382 (Fla. 1st DCA 1989); Graham v. State, 470 So.2d 97 (Fla. 1st DCA 1985); and Leon v. State, 396 So.2d 203 (Fla. 3d DCA), review denied, 407 So.2d 1106 (Fla. 1981). Where the record reflects a reasonable doubt as to whether a challenged juror can be fair and render an unbiased verdict, failure to dismiss for cause cannot be harmless error, "because it abridge[s] appellant's right to peremptory challenges by reducing the number of those challenges available him." Hill, 477 So.2d at 556. In Hill, the court recited the general rule followed in Florida and most other jurisdictions that "it is reversible error for a court to force a party to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges, and an additional challenge is sought and denied." Id. See also Moore, 525 So.2d at 873.
The fact scenario in Moore is somewhat similar to that of the instant case with respect to the challenge for cause of jurors Roddenberry and Eckert. In Moore, a prospective juror voiced skepticism about insanity as a defense, in much the same terms employed by jurors Roddenberry and Eckert in this case. And in Moore, as here, the sole defense was lack of mental competency. Defense counsel in Moore exercised a peremptory challenge to excuse the objectionable juror, after the trial court denied his challenge for cause. Subsequently, Moore exhausted his peremptory challenges and his request for additional challenges was denied by the trial *379 court. Concluding that the challenged juror's comments raised a reasonable doubt concerning whether he could follow the court's instructions on the insanity issue and render an unbiased verdict, the court reversed for a new trial. 525 So.2d at 873.
The record in this case reflects that jurors Roddenberry and Eckert did not possess impartial and unbiased minds with respect to insanity as a legal defense. Although each juror expressed a willingness to try to follow the court's instruction on the law, their comments on voir dire were somewhat equivocal and not without reservation. Although we are cognizant of the deference due the trial court's superior vantage point to observe the jurors' demeanor and to evaluate their oral responses, we conclude that the challenged jurors' comments raised a reasonable doubt as to their ability to render an unbiased verdict, within the contemplation of Moore. In our view, Moore compels reversal of the trial court's rejection of the challenges for cause to jurors Roddenberry and Eckert, and the court's refusal to grant additional peremptory challenges for their removal from the jury. However, we reach a different conclusion with regard to juror Crum. Despite Mrs. Crum's exposure to pretrial publicity and her prior knowledge of appellant's confession, her responses to questions posed to her by the lawyers and by the trial court indicate Mrs. Crum's ability to fulfill her duties as a juror. Therefore, we find no error in the trial court's rulings with respect to Mrs. Crum.
The second issue concerns the trial court's denial of appellant's motion for change of venue. The motion was based on prejudicial pre-trial publicity. It is well settled that a trial court's ruling on a motion for change of venue will be upheld absent a manifest abuse of discretion. Holsworth v. State, 522 So.2d 348, 351 (Fla. 1988); Mills v. State, 462 So.2d 1075, 1078 (Fla.), cert. denied, 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985). The test for change of venue is "whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." Holsworth, 522 So.2d at 350, quoting McCaskill v. State, 344 So.2d 1276, 1278 (Fla. 1977). Community hostility may be established by (1) inflammatory publicity, or (2) great difficulty in selecting a jury. Holsworth, 522 So.2d at 350; Copeland v. State, 457 So.2d 1012, 1017 (Fla. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985).
Jury exposure to news accounts of a crime does not presumptively deprive a criminal defendant of due process. Rather, to warrant a change of venue, a defendant must show the existence of inherent prejudice in the trial setting, or facts related to the jury selection process which permit an inference of actual prejudice. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); McCaskill, 344 So.2d at 1278. Although publicity about a confession may be inflammatory, it is not enough, standing alone, to warrant a change of venue. Holsworth. The critical factor in connection with pretrial publicity is the extent of the prejudice or lack of impartiality among potential jurors. Id., at 351.
Prejudice from pretrial publicity is presumed where the publicity was sufficiently prejudicial and inflammatory that it pervaded the community where the trial was held. Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986), citing Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Murphy v. Florida, 95 S.Ct. at 2035. In Rideau, the defendant confessed to robbing a bank in a Louisiana parish, kidnapping three bank employees, and killing one of them. His confession was videotaped and broadcast three times by a local television station. The broadcasts were seen by 24,000; 53,000; and 29,000 people in the community of 150,000. The trial court denied a change of venue; the defendant was convicted and sentenced to death. Although only three jurors who decided the *380 case had seen the televised confession, the Supreme Court presumed prejudice, concluding that the televised confession was the trial. 83 S.Ct. at 1419. In Murphy, however, prejudice was not presumed. There, the Court noted that the challenged news articles appeared seven to twenty months before the jury was selected, and were largely factual in nature. Further, the crimes committed by Murphy, i.e., burglary and jewel robbery, although somewhat dramatic, did not generate community animosity of the sort engendered by kidnapping and murder. 95 S.Ct. at 2037.
In an analogous vein, in Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), a high school teacher was convicted of the murder of one of his students. Yount gave oral and written confessions, was convicted, and sentenced to life imprisonment. The conviction was reversed due to inadequate Miranda warnings, and the case was remanded for a new trial. At the second trial, written confessions and a portion of the oral confession were suppressed. Yount moved for change of venue on the basis of widespread dissemination of prejudicial information that could not be eradicated from the minds of potential jurors. Yount was convicted a second time of first degree murder. The Supreme Court found that extensive adverse publicity and the community's sense of outrage were at their height at the time of Yount's first trial. However, the second trial occurred four years later, when prejudicial publicity had diminished and community attitude had softened. The Court held that in these circumstances, the trial court did not err in finding that the jury was as a whole impartial.
We do not find reversible error with regard to the trial court's denial of the motion to change venue. See, generally, Copeland v. State. However, because the case is being reversed and remanded for retrial on the juror issue, and in light of the extreme difficulty in selecting a jury for the first trial, on remand, the trial court should be particularly sensitive to the venue issue.
The third issue concerns the denial of appellant's motion to suppress alleged statements made by her to law enforcement officers after she was transported to the Sheriff's Department. Miranda warnings are required to be given only when a person is "in custody" or his freedom has been significantly restrained so as to emulate a custody situation. Miranda v. Arizona, 384 U.S. at 478, 86 S.Ct. at 1629; Caso v. State, 524 So.2d 422, 423 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). The test for determining whether a suspect is in custody for purposes of the Fifth Amendment safeguards is whether a reasonable person in the suspect's position would have believed his freedom of movement was restrained to the degree associated with a formal arrest. California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983); Caso, 524 So.2d at 423; Roman v. State, 475 So.2d 1228, 1231 (Fla. 1985), cert. denied, 475 U.S. 1090, 106 S.Ct. 1480, 89 L.Ed.2d 734 (1986); State v. Hall, 537 So.2d 171, 172 (Fla. 1st DCA 1989). Application of the test requires a consideration of the totality of all the surrounding circumstances. Schneckcloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); Drake v. State, 441 So.2d 1079, 1081 (Fla. 1983), cert. denied, 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 832 (1984); B.S. v. State, 548 So.2d 838, 839 (Fla. 3d DCA 1989); 2 W. LaFave, Search & Seizure § 5.1(a), at 390 nn. 20-21 (2d ed. 1987), and cases cited therein. Relevant factors include (1) the inherently coercive nature of police officers as authority figures, (2) the vulnerability of youth to such authority figures, (3) and whether the officers clearly stated that the person sought to be interrogated was not obligated to accompany them, and had every right to refuse to do so. See Drake, 441 So.2d at 1081. Further, it is well settled that interrogation at the stationhouse at the request of the police is inherently more coercive than interrogation in other less suggestive settings. Drake; B.S., 548 So.2d at 839; Butler v. State, 544 So.2d 1115, 1116 (Fla. 3d DCA 1989). Thus, the location of the interrogation will have a significant bearing *381 on the reasonableness of an individual's belief that his or her freedom of movement has been restrained.
However, if supported by sufficient evidence, a trial court's finding that a confession was voluntary will not be disturbed on appeal. Caso v. State, 524 So.2d at 424. The determination of issues of fact based upon conflicting evidence is the prerogative of the trier of fact, and if supported by competent and substantial evidence, may not be reversed on appeal. Boykin v. State, 309 So.2d 211 (Fla. 1st DCA 1975).
Miranda rights do not commence upon the discovery of facts justifying an arrest, or because a person is the focus of a criminal investigation. Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). The test for "in custody" is how a reasonable person in the suspect's position would have understood the situation. Berkmer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). In this case, the trial court found that appellant was not in a custodial setting until she made the statement that she "just snapped." That conclusion is supported by evidence in the record.
There is no custody solely because the person is present in response to an "invitation" from the police, or because the questioning took place at the police station, or because the questioned person is the suspect. Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). Appellant was asked to go to the station. That does not automatically mean that she was taken into custody. The explanation provided by the officers conducting the investigation is reasonable. That is, the Noes were taken to the station because the large number of people present at the trailer made it difficult for the officers to talk to them there. This conduct appears consistent with standard investigatory procedure which involves questioning that person reasonably believed to have been the last known person to have seen the murder victim alive. In this case, that person happened to be appellant. The interview lasted less than two hours before the incriminating statement was uttered. The appellant was given two breaks during the interview, and nothing was said to indicate that she was not free to leave prior to her confession. The evidence indicates that she did not request to see her husband until after her taped statement was given. The questions asked did not appear to be especially intimidating, and could be characterized as the kind that are posed to a witness rather than a suspect. The evidence supports a reasonable determination by a trier of fact that a reasonable person would not have considered the situation as being in custody.
Coercive police activity is a necessary predicate to a finding that a confession is not voluntary and that a waiver of Miranda rights is not voluntary. Colorado v. Connelly, 479 U.S. 157, 167, 169-170, 107 S.Ct. 515, 521, 522-523, 93 L.Ed.2d 473 (1986). The evidence in this case supports a view that appellant was not threatened, coerced, or promised anything to confess. Therefore, as to the third issue, the trial court's denial of appellant's motion to suppress statements is affirmed.
Accordingly, we reverse with respect to the denial of challenges for cause to jurors Roddenberry and Eckert, and remand with directions to grant a new trial. We affirm the trial court's ruling concerning denial of appellant's motion to suppress statement. We do not reach the fourth issue, since it is rendered moot by our remand for new trial.
ERVIN and MINER, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).