606 So.2d 1194 (1992)
Albert Thomas AGUILERA, Appellant,
v.
STATE of Florida, Appellee.
No. 90-2175.
District Court of Appeal of Florida, First District.
September 17, 1992.
Rehearing Denied October 27, 1992.
*1195 Leo A. Thomas of Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, for appellant.
Robert A. Butterworth, Atty. Gen., Charlie McCoy, Asst. Atty. Gen., Tallahassee, for appellee.
SMITH, Judge.
Appellant, Albert Thomas Aguilera, was convicted by a jury of the offenses of first degree murder and shooting a firearm into an occupied vehicle, and was sentenced by the court to life in prison without parole for 25 years. In this appeal, appellant urges reversal of his convictions and sentences based upon (1) rulings by the trial court during the jury selection process resulting in denial of appellant's right to a fair and *1196 impartial jury; (2) the trial court's denial of his motion for judgment of acquittal, or for a new trial, grounded upon overwhelming evidence of appellant's insanity at the time of the offenses; and (3) the trial court's denial of appellant's motion to reduce the homicide charge to second degree murder. We affirm on all issues.
The evidence presented by the state at trial, at which appellant's sole defense was that of insanity, established without doubt or contradictory evidence that appellant shot and killed the victim, Matthew Miller, on January 3, 1989. The events of that day, including the activities of appellant before, during, and after the shooting, and his apprehension and arrest by officers a short time after the crimes, will be briefly related below. At 7:00 in the morning on the day of the shooting, appellant was in a Krispy Kreme Donut Shop in Pensacola. There he turned to a lady who knew him only by sight and asked: "Is it true the only unpardonable sin is suicide?" Receiving an affirmative response, appellant said: "You know, my medicine has not been working too well." Within an hour, appellant appeared at a nearby Waffle House Restaurant, where he was known to the waitresses working there. On the same day, shortly before 11:00 A.M., appellant went to Lake View Center, a facility furnishing counseling and treatment for mental patients, where he was interviewed and had lunch with a mental health worker. Appellant stayed at the center until about 3:00 in the afternoon.
Between 3:00 P.M. and 4:30 P.M., appellant went to the Gulf Breeze Pistol Shop where he purchased a .38 caliber pistol and ammunition. During the selection and purchase of the gun, which consumed about 20 to 25 minutes, appellant was required to fill out an application form in which he denied a history of mental illness. After purchasing the gun, appellant drove into some nearby woods where he test-fired the weapon. He then drove to a Tom Thumb Convenience Store, also located in Gulf Breeze, where the victim, Matthew Miller, had just purchased some gasoline, and was sitting in his car at the pump. Appellant left his car, walked to Miller's car, and as Miller was about to drive off, appellant raised his gun and fired one bullet through the driver's side window into Miller's head killing him instantly. Appellant raised the gun in the air, turned and slowly walked off, entered his automobile, and drove slowly away along Highway 98 in an easterly direction. After travelling less than one mile, appellant made a U-turn, returned to the same intersection where the Tom Thumb Store was located, then turned into a subdivision directly across the street from the store. At the site of a home under construction in the subdivision, appellant buried the revolver, a cartridge box, and several rounds of ammunition. Some eleven feet away from where the revolver was buried, he left leaning up against a tree the blue box in which the gun was purchased from the gun shop.
Within 30 minutes after the shooting, appellant was apprehended as he drove across the Bay Bridge toward Pensacola. In the middle of the front seat of his car at the time an officer discovered a spent .38 caliber casing. Appellant told the arresting officer that he shot the victim "because the victim had his girlfriend and would not let him have any of the girls in town."[1] Appellant also accused one of the officers of having his girlfriend. Later on that day, a gunshot residue test was conducted, which disclosed gunshot residue on appellant's right hand. Several days later, officers recovered the gun, the cartridge box and cartridges, and the blue gun box, upon which four latent fingerprints were found matching those of appellant.
The evidence established that the victim lived in an apartment complex located approximately 100 yards off Highway 98 behind *1197 the Tom Thumb Store where the shooting occurred. He had lived there approximately a month and a half prior to his death. The apartment manager testified that she had seen appellant with the victim, Matthew Miller, prior to the day of the shooting, when Miller came into the office to pay rent. She also testified that she had seen appellant's car in the vicinity of the victim's apartment on a prior occasion, with appellant sitting in it; and that she had seen appellant in his car on the premises the same day Matthew Miller was killed.
Prior to trial, appellant's counsel timely filed a notice of intention to rely on the defense of not guilty by reason of insanity. Several psychologists and psychiatrists were appointed by the court to determine appellant's competency to stand trial, and to determine his sanity at the time of the alleged offense. Appellant, who was 34 years of age at the time of trial, had a long history of diagnosis and treatment as a paranoid schizophrenic. On July 27, 1989, the trial court entered an order finding appellant incompetent to stand trial, committing him to the Department of Health and Rehabilitative Services. Appellant was discharged on October 31, 1989, returned to the Santa Rosa County Jail, and on November 16, 1989 the court again ordered doctors to examine and report on appellant's competency to stand trial. The court subsequently found appellant competent to stand trial. Upon conviction and being sentenced, appellant timely filed his notice of appeal.
Appellant raises several alleged errors in the jury selection process. He first urges that the trial court erred in excusing the only two black jurors from the venire over appellant's Neil objection.[2] The first of the two black jurors excused, juror McCray, answered affirmatively to the question whether she had any philosophical, emotional, or moral or other reason why she could not sit in judgment on another human being. She explained:
I just do not feel like I was seated on a jury that I can decide if he was right or wrong as to what he did. Because I don't know what was in his mind or his heart at the time when it happened. And I don't think that I can make a decision unless  and I just don't think that I can judge the person.
The prosecutor then asked the question: "And do you think that your feelings as you sit right now can prevent you from being a fair juror in this case?" Mrs. McCray: "Probably  I mean I just do not feel that I should be, should have to make a decision, you know... ."
The state moved to excuse McCray for cause, to which appellant's counsel objected, arguing that the juror also indicated that she could sit as a juror and follow the law if she had to, and that the state's attempt to excuse the juror amounted to a systematic exclusion of blacks, since there were only two available. The trial court, although expressing doubt that inquiry was called for under Neil and Slappy (supra, footnote 2), directed the prosecutor to state its reasons for the challenge for cause. The prosecutor responded that the juror had stated that her beliefs would not allow her to sit in judgment of another person, and that this would affect her ability to perform as a juror. The court ruled that the challenge for cause would be granted, stating:
She did say that she can follow the law if she was forced to do so, but she did combine that with a statement that she's a scary kind of person and she has a child. And what  it was very clear to me that she was saying that she was afraid that if she was forced to sit on the jury that in some way it would come to the detriment of her child. And in what way  that was not clear but that's what she seemed to be saying. It is not clear to me at all that she would follow the law. She  responded, Mr. Thomas, only with hesitance to your probing of her. *1198 And I think that both counsel probed appropriately on that. But I think that she's proper for a cause for challenge [sic].
As to the second black juror, McCorvey, the state used a peremptory strike, prompting defense counsel to again request a Neil inquiry. The prosecutor stated that the only reason for exercising a peremptory was "to save a hardship," pointing out that Juror McCorvey stated upon being questioned individually that she is the sole caregiver for her father, who was 84 years of age; that her father had had a stroke, half of his body is paralyzed, and he is "loaded with infection" at the present time. Further, juror McCorvey stated, she was concerned about the availability of a reliable person to look after her father in her absence, and that she needed to take him to the doctor the next day. The trial court agreed that juror McCorvey met the criteria for hardship under the statute, section 40.013(6) or (9), Florida Statutes and ruled that the state had demonstrated a nonracial reason for excusing McCorvey.
We first dispose of appellant's contention that the excusal of juror McCorvey was not shown to be based upon a race-neutral reason. The trial judge found, and we agree, that juror McCorvey met the criteria for excusal for hardship under the statute. We are of the view that the trial court could reasonably find that the prosecutor's explanation for excusing the juror was for a race-neutral reason.
As to juror McCray, we note the state's argument on appeal that a prima facie showing of racially-motivated excusal was not made below, in that McCray was the first black juror sought to be excused by the state, and that the state's excusal was by means of challenge for cause, not by exercise of a peremptory challenge. We find it unnecessary to reach this issue.[3] The trial court, although not totally convinced of the necessity for it, nevertheless required the state to explain the basis for challenge. We agree with the state's argument that a juror's perceived inability to sit in judgment on another person and follow the law is a race-neutral reason for excusal, and that the trial court's excusal of McCray for cause was not manifest error. We are compelled to defer to the judgment of the trial judge, who saw and heard the juror, rather than to rely upon our own assessment of the qualifications of the juror based upon our reading of the cold record. Singer v. State, 109 So.2d 7, 23 (Fla. 1959) (the question of competency of a challenged juror is one of mixed law and fact to be determined by the trial court in its discretion; and this decision will not be disturbed unless error is manifest); State v. Williams, 465 So.2d 1229 (Fla. 1985) (trial judge, who sees and hears prospective juror is in best position to judge juror's bias and credibility, and therefore has broad discretion regarding juror bias which will not be disturbed absent showing that error is manifest); and Reed v. State, 560 So.2d 203, 206 (Fla.), cert. denied, ___ U.S. ___, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990) (in achieving delicate balance between eliminating racial prejudice and the right to exercise peremptory challenges, appellate court must necessarily rely on the inherent fairness and color-blindness of trial judges on the scene and who get a "feel" for what is going on in the jury selection process).
During jury selection, a number of prospective jurors were closely questioned concerning their views on insanity as a defense to criminal charges, and the failure of the accused to testify in his own behalf. Among these prospective jurors were Mr. Willis and Mr. Saxton.
Concerning the insanity defense, Mr. Willis stated:
I personally have trouble with the insanity [sic]. And I  I have a tendency to *1199 belief [sic] that someone commits an act, regardless of insanity. And I know what the law says but  and I would have a tendency to follow but I do not believe it.
Upon further questioning of Mr. Willis by counsel and the court concerning whether he could follow the law if his (Willis's) definition of insanity differed from the law as instructed by the law, Mr. Willis stated: "I believe that I could." Mr. Willis explained further that his "biggest problem" is that he could not get in his mind "when someone is insane and is not"; that he had doubts "whether someone could do it and be ... insane or whether they are not"; but that he could listen to the evidence and "be clear as to what the court wants," and could vote not guilty if the state did not prove the defendant was sane.
Defense counsel moved to strike Mr. Willis for cause based upon his expressed doubts concerning the insanity defense. The court denied the motion, stating that the juror appeared to be very clear as to his willingness to follow the law, and that "he had an open mind and would listen to the evidence and apply the law." Defense counsel then peremptorily struck Mr. Willis.
Mr. Saxton, when questioned about how he felt concerning insanity as a valid defense, stated:
Oh  I don't quite go along with that because  if he's considered guilty of the crime then they say that he's insane, well  I would have to hear more information to find out what he was like before he committed the crime if he was insane before and what led up to it and things like that.
In addition to his expressed reservations concerning the insanity defense, Mr. Saxton also revealed a problem with respect to the defendant's failure to testify. When questioned by defense counsel as to what "message" he would get if the defendant did not take the witness stand and testify, Mr. Saxton answered:
Well, I will think that he's hiding something, scared. And if you're not afraid of anything that you would get up and tell it like it is.
Continuing his questions, defense counsel inquired whether the defendant's failure to take the witness stand would be "some inference or implication that he's guilty because he's hiding something." Mr. Saxton answered: "Right, possibly, yes, sir."
Defense counsel's motion to strike Mr. Saxton for cause was denied by the court. In explaining her ruling on juror Saxton, the trial judge remarked that the defense asked "open-ended" questions at a time when the juror did not know the law, and that upon being advised of the law, the juror stated unequivocally that he could follow the law. The defense did not excuse Mr. Saxton, and he was later sworn and served as a juror.
This court recently visited the law governing the qualifications of jurors to sit in a criminal case where the sole defense was insanity of the defendant at the time of commission of the offense. In Noe v. State, 586 So.2d 371 (Fla. 1st DCA 1991), rev. denied, 598 So.2d 77, 78 (Fla. 1992), this court reversed a conviction of first-degree murder because of errors in the trial court's seating of two jurors. In Noe, this court found that the two jurors were not impartial and unbiased with respect to the defense of insanity; and although each juror expressed willingness to follow the court's instructions on the law, "their comments on voir dire were somewhat equivocal and not without reservation."[4]
Notwithstanding appellant's substantial arguments suggesting that jurors *1200 Willis and Saxton, like the jurors in Noe, were not possessed of "impartial and unbiased minds" (Noe, 586 So.2d at 379) with respect to the insanity defense, and Mr. Saxton with respect to the defendant's failure to testify, we find that the issue has not been preserved for our review on the merits.
In Hill v. State, 477 So.2d 553 (Fla. 1985), the supreme court reversed a death sentence because of the trial court's erroneous denial of a defense challenge for cause to a juror who had a preexisting opinion regarding the penalty to be imposed in the case. The court held that it is reversible error for the trial court to force a party to use a peremptory challenge on prospective jurors who should have been excused for cause, "provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied." Id. at 556. The court found that a challenge for cause had been improperly denied, the defendant had subsequently exhausted his peremptory challenges, and the defendant's request for additional challenges had been denied.
In Moore v. State, 525 So.2d 870, 873 (Fla. 1988), citing Hill, the court again reversed, again stating that reversible error is shown when a challenge for cause is improperly denied, forcing a party to use a peremptory challenge, when all peremptory challenges are subsequently exhausted, and a request for additional peremptory challenges is denied.
In the light of the foregoing decisions, and others in similar vein, we turn to the facts of the case before us. Jury selection began on April 26, 1990, and continued through April 27. After twelve jurors had been seated, including Mr. Saxton, the defense had one remaining peremptory challenge. At this point, the state tendered the jury. Defense counsel immediately requested three additional peremptory challenges, which request was denied.[5] The trial judge again stated that she thought the request was premature, and upon inquiry by the judge, the prosecutor advised the court: "[T]he court does not have to grant any peremptories until [the defense] has exhausted. And I think the court can exercise its discretion as to whether or not any additional peremptories are required." Defense counsel then stated that he would exhaust all peremptories if he had three more, but without the three, he could not exhaust his last challenge. At this point, the court granted the defense (and the state) one additional challenge. Defense counsel, not satisfied with one additional, then announced that based upon getting only one additional challenge, he would not exercise any more peremptories. A twelve person jury then being seated, the court proceeded with selection of alternates. After both sides exercised challenges to certain alternates, Mr. Nicholas and Mrs. Naile were selected as alternate jurors. Without objection, the court then excused the remaining four unselected jurors, and *1201 instructed the panel of twelve, and the two alternates, to return to court for trial on May 7, 1990. The court proceedings were then adjourned until the trial date.
As above-stated, jury selection was completed with the defense having two unused peremptories, unselected jurors were excused by the court, not to return, and the selected jurors and alternates were ordered to appear for trial, to commence 10 days later. The jury was not sworn at this time, however.
On the scheduled trial date, in preliminary proceedings before the court, defense counsel announced that he had received some information indicating prejudice on the part of one seated juror, Mr. LaCoste, and moved to peremptorily excuse him, which the court allowed.[6] The first alternate, Mr. Nicholas, was then seated as a regular juror in the place of Mr. LaCoste. However, defense counsel announced that the defense would strike Mr. Nicholas. Again, the court allowed the defense to excuse the juror, and the last remaining alternate, Mrs. Naile, was called and was seated as the twelfth juror.[7] Both the state and the defense agreed to proceed with no alternates.
After defense counsel used his last two peremptories to strike Mr. LaCoste and Mr. Nicholas, defense counsel made no request for additional peremptory challenges, nor did defense counsel renew any objection previously made as to any individual juror, or bring to the court's attention any objection to or dissatisfaction with the jury as seated. The jury was sworn, and the trial commenced.
We must now consider whether the alleged error in the denial of challenge for cause as to jurors Willis and Saxton has been preserved for review. We are aware of the factual distinction between this case and the Hill and Moore cases, in that in those cases the objectionable juror was excused by the use of a peremptory challenge, and did not sit in the trial of the case; whereas, in this case, only juror Willis was peremptorily excused by the defense, while Mr. Saxton was not excused, and sat as a trial juror. However, for purposes of review we believe this to be a distinction without a difference in this case.
As noted, jury selection was completed with the defense having two unused peremptories (one of these was an additional challenge granted by the court); the remaining jurors were excused by the court without objection by the defense; and on the trial date, 10 days later, defense counsel used his last two peremptories to excuse jurors other than Mr. Saxton; and after exhausting all peremptories, defense counsel made no request for additional peremptory challenges.
As seen from the foregoing, although the challenged juror, Mr. Saxton, remained on the jury, this resulted from a choice made by defense counsel. It is clear that defense counsel had the option, before trial, to use his additional peremptory (one of his two remaining) to excuse Mr. Saxton, rather than Mr. LaCoste or Mr. Nicholas. As noted, there had been no challenge for cause as to Mr. Nicholas; and although there was a challenge for cause as to Mr. LaCoste (see footnote 6), counsel on appeal makes no argument that the trial court erred in denying his challenge of Mr. LaCoste for cause. Thus, while Hill and Moore do not speak to the situation presented here, where an allegedly unqualified juror is not peremptorily excused, we do not feel that the requirement of requesting *1202 additional peremptories, after exhaustion of all peremptories, is any less applicable as a prerequisite to a finding of reversible error under these facts.
We are of the view that any error in the seating of Mr. Saxton, resulting from a deliberate choice by defense counsel after the trial court's failure to grant a challenge for cause, although technically not harmless error, should nevertheless in this case be treated the same as those cases in which the unqualified juror was excused by the use of a peremptory challenge. This is so because the trial court allowed one additional peremptory, so that the defense had two unused challenges at the completion of jury selection, which could have, but were not used, to excuse Mr. LaCoste and Mr. Saxton. Instead, after waiting until just moments before trial, defense counsel struck Mr. LaCoste, but failed to use the extra challenge to excuse Mr. Saxton, choosing instead to excuse Mr. Nicholas. Thereafter, no request was made for additional peremptories.[8]
Under these circumstances, we find that appellant has either waived the alleged error in denial of the challenge for cause as to Mr. Saxton, thereby precluding review, or that by using the additional peremptory granted by the court to excuse a juror not shown to be unqualified, defendant has failed to demonstrate prejudice resulting from the trial court's denial of a challenge as to Saxton. See, Pentecost v. State, 545 So.2d 861 (Fla. 1989) (denial of challenge for cause as to two jurors not reversible error where defendant had numerous peremptory challenges remaining, but chose not to exercise any on the two objectionable jurors); Rollins v. State, 148 So.2d 274 (Fla. 1963) (reversible error not shown where even assuming error in denial of challenge for cause as to one juror, defendant was not required to accept an objectionable or unqualified juror after he exhausted his peremptory challenges).
In his second point on appeal, appellant argues for reversal on the grounds that because of the overwhelming evidence of appellant's insanity at the time of the offense, appellant is entitled to a judgment of acquittal or a new trial. Appellant relies heavily upon the extensive evidence documenting appellant's 15-year history of paranoid schizophrenia. He also urges that the state's expert witness, Dr. Harry McClaren, was mistaken in his interpretation of the McNaghten rule,[9] as adopted and applied under Florida law; and further, that because of Dr. McClaren's mistaken interpretation, his testimony should not have been admitted by the trial court. In brief, appellant argues that although Dr. McClaren agreed that defendant suffered from a mental illness, and that he could have been delusional at the time of commission of the offense, Dr. McClaren was nevertheless under the opinion that appellant knew what he was doing and its consequences when he fired the gun into the head of the victim, and knew that what he was doing was wrong.
The state argues in response that although appellant presented expert witnesses who testified that in their opinion appellant was legally insane at the time of the offense, the jury was free to accept or reject the testimony of appellant's witnesses, and to rely upon that of the state's expert witness. Furthermore, the state urges, the case for the prosecution included not only its expert witness, but also testimony of lay witnesses who observed appellant at or near the time of commission of the offense, as well as other factual evidence establishing appellant's actions in relation *1203 to the crime such as purchase of the gun, test-firing of the weapon, and his attempts to conceal the weapon after the crime. The state concedes that the evidence presented by the appellant presented a prima facie case of insanity. The state further argues, however, and we agree, that the state's case-in-chief and its rebuttal expert witness supplied sufficient evidence from which the jurors could conclude that appellant was legally sane so as to be criminally responsible for his actions. As noted by the state's expert, Dr. McClaren, appellant's illness was chronic and of long-standing duration; and that he had years of crime-free functioning under its effects. Dr. McClaren further pointed to appellant's actions in giving false answers on the firearm purchase form; his going to a secluded place to test the weapon; and his attempted flight and disposal of the weapon after the crime.
From our review of the record we conclude that the jury reasonably could have concluded that appellant failed to meet the test for insanity under Florida law.[10]See Gurganus v. State, 451 So.2d 817 (Fla. 1984).
Finally, with respect to appellant's contention that appellant's paranoid delusions rendered him incapable of knowing that it was morally wrong to kill the victim, we note that this court has recently rejected a similar argument in Hansen v. State, 585 So.2d 1056 (Fla. 1st DCA), rev. denied, 593 So.2d 1052 (Fla. 1991) (moral insanity is not a defense to criminal acts under the law of Florida).
For the foregoing reasons, we also reject appellant's contention that he is entitled to a new trial in the interest of justice because of the overwhelming evidence of insanity at the time of the commission of the act. The evidence that appellant was suffering from a mental illness or defect was indeed strong. On the other hand, as the state points out, the evidence indicating appellant's understanding of the nature and consequences of his acts, and that his acts were wrong, is also substantial. It is true, and the state concedes, that the state was unable to prove a motive for the crime. Nevertheless, the state's expert did not rely upon the existence of any particular motive in formulating his opinion as to appellant's sanity, and we do not find that the absence of a motive invalidates the decision of the trial judge to submit the case to the jury, nor would the absence of a motive entitle appellant to a new trial in the interest of justice. We agree with the state that the alleged tenuousness of otherwise sufficient evidence is not a basis for a new trial under Florida law. Tibbs v. State, 397 So.2d 1120 (Fla. 1981), affirmed, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (no appellate court should reverse a conviction or judgment on the ground that the weight of the evidence is tenuous or insubstantial).
In his third point on appeal, appellant urges that the trial court erred in *1204 failing to reduce the charge to second degree murder. Appellant points out that all testimony as to appellant's state of mind was that he was delusional and hallucinating at the time he shot the victim. Accordingly, appellant argues, since the shooting was not done after a conscious decision, and there was no premeditation, the court should reduce the conviction to second degree murder, citing Jenkins v. State, 120 Fla. 26, 161 So. 840 (1935); Forehand v. State, 171 So. 241 (Fla. 1936). Since the evidence was insufficient to go to the jury on premeditation, appellant contends, the trial court should have reduced the charge to second degree murder, citing Hall v. State, 403 So.2d 1319 (Fla. 1981).
We are unpersuaded by these arguments. As pointed out by the state, the evidence bearing on the issue of sanity, and upon the ability to premeditate, was much the same. Each side's experts reached opposite conclusions. Furthermore, the nonexpert testimony was susceptible of differing interpretations and inferences, all of which, in the light most favorable to the state, indicated a conscious design, purpose or plan to effect the death of the victim.
For the foregoing reasons, the judgment of conviction and sentence are hereby AFFIRMED.
JOANOS, C.J. and BARFIELD, J., concur.
NOTES
[1] Testimony and records documenting appellant's mental condition disclosed that his most persistent delusion over the years involved his inability to "get a girl" because men were keeping them from him.
[2] State v. Neil, 457 So.2d 481 (Fla. 1984); and see State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988).
[3] See, Knowles v. State, 543 So.2d 1258 (Fla. 4th DCA 1989) (where prosecutor removed one of two black jurors on the panel through challenge for cause, then struck second black juror by use of a peremptory, defense counsel properly raised challenge to state's striking of remaining black juror).
[4] As noted by the court in Noe, the trial court is required to adhere to the much-quoted rule from Singer v. State, 109 So.2d at 23-24:

... [I]f there is basis for any reasonable doubt as to any jurors possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence submitted and the law announced at the trial he should be excused on motion of a party, or by the court on its own motion.
At the risk of undue repetition, we think that the guidelines for application of the Singer rule as stated in Noe, 586 So.2d at 378, bear repeating again:
In application of the rule, the following guidelines should be considered: (1) a juror's statement that he would render a verdict according to the evidence is not sufficient of itself to overcome what he has said about forming an opinion; (2) every juror should come to the investigation of a case free from any preconceived impression of it; (3) if there is doubt as to the juror's sense of fairness or his mental integrity, he should be excused; (4) a juror who has asserted views of bias and prejudice cannot be considered free of such merely because, under skillful questioning, he declares himself free of its influence. Singer, 109 So.2d at 22-24. `Close cases involving challenge to the impartiality of potential jurors should be resolved in favor of excusing the juror rather than leaving doubt as to his or her impartiality.' Phillips v. State, 572 So.2d 16 (Fla. 4th DCA 1990). See also Sydleman v. Bensen, 463 So.2d 533 (Fla. 4th DCA 1985).
[5] At various times earlier in the jury selection proceeding defense counsel requested additional peremptories, and each time the court indicated the request was premature: request for ten  court reserved ruling, noting there would not be enough jurors if each side had twenty; request for five  court reserved ruling, noting each side still had nine challenges; request for six  court notes defense has three remaining, request is premature, and court will reserve ruling; request for "additional" challenges  court notes large number being excused for cause, many by agreement, and additional peremptories did not appear necessary.
[6] We reject the contention by the state that the defense did not "exhaust" its peremptory challenges because they were not exercised during the jury selection proceeding 10 days before trial. The trial court followed the correct rule, in our view, which is that the defendant may challenge prospective jurors at any time before the jury is sworn. Gilliam v. State, 514 So.2d 1098 (Fla. 1987); Lewis v. State, 593 So.2d 1195 (Fla. 4th DCA 1992).
[7] We note that early in the jury selection process defense counsel challenged Mr. LaCoste for cause, based upon his acquaintance with a state witness. The challenge was denied. The record reveals no attempt to challenge Mr. Nicholas for cause.
[8] The fact that no additional prospective jurors were present at trial is irrelevant. Defense counsel allowed the court without objection to excuse all unselected jurors 10 days before trial, and made no request of the court to summon additional jurors thereafter. Since no request was made for additional jurors at the trial, it cannot be shown that the court would not have granted such request, and that additional jurors could have been made available, even at that late date.
[9] M'Naghten, (Common Law of England), 10 Clark & F. 200 (1843).
[10] The record reveals that defense counsel thoroughly prepared and skillfully presented both documentary and testimonial evidence confirming appellant's long history of mental illness. We observe however, that despite the proven gravity of appellant's mental condition, there was testimony from some of the health care workers involved in appellant's treatment that would tend to support the state's contention that appellant knew the consequences of his act, and knew that it was wrong. Mary Sigler, case manager at Lakeview Center, testified that even though appellant at times would say he was hearing voices, he could carry on a conversation, and follow instructions; that he understood the wrongfulness of shooting a person, and that he was oriented to the "three spheres"  meaning "time, place and person." Another Lakeview mental health specialist, James Ronnie Kemp, testified that although a paranoid schizophrenic, appellant had normal intellectual functioning or cognitive ability, and that he was capable of living on his own, having a bank account, and driving a vehicle  but not without close supervision. Mr. Kemp saw appellant at Lakeview on the day of the shooting, had lunch with him, and saw him again later at about 3:00 P.M. Mr. Kemp stated that although appellant looked "anxious" at lunch, he made no overt observation that appellant had anything significant "going on in his head" that he did not externalize; but that was not to say that he did not.