701 So.2d 375 (1997)
The STATE of Florida, Appellant,
v.
Marie GILLES, Appellee.
No. 96-2551.
District Court of Appeal of Florida, Third District.
October 29, 1997.
Robert A. Butterworth, Attorney General, and Fredericka Sands, Assistant Attorney General, for appellant.
Honey Hartman, Hollywood, for appellee.
Before NESBITT, COPE and FLETCHER, JJ.
FLETCHER, Judge.
The State appeals an order suppressing statements made to police by defendant Marie *376 Gilles. Because our review of the record reveals that her pre-Miranda warning statements were not made while in custody, and her post-Miranda warning statement was voluntarily given, we reverse.
At 11:30 one evening in 1995[1] uniformed police were summoned to a murder scene at the home of the defendant and her family. By initial appearances the defendant and her husband had been the victims of a home invasion robbery during which the husband was killed.
The lead detective arrived on the scene at 1:29 A.M. Shortly thereafter, the detective had the defendant and her two children (ages fourteen and sixteen) driven to the North Miami police station because the Gilles home had been roped off for crime scene processing and the family could not be allowed back in. The detective also wished to obtain statements about the occurrence.
At the North Miami police station the defendant was seated in the lobby together with her son and daughter. The North Miami police station lobby is not large and contains a row of padded chairs along a wall, a water fountain, restrooms, and a telephone. The front door to the police station (which was unlocked) was approximately four feet from where the defendant and her children were situated. The defendant was free to leave at any time, for food, for a change in clothing, in order to sleep elsewhere, or for no reason but her desire to do so.
At about 4:15 A.M., the defendant was interviewed by the lead detective in a small room in the detective bureau which is located by the lobby. At that time the defendant was not a suspect of any kind but was viewed as a witness and victim. Because of this, she was not "read her rights" at that time and remained free to leave. This first interview lasted for a short time, up to one hour, after which the defendant returned to the lobby where her teenage son and daughter were waiting.
At 7:00 A.M., the detective interviewed several other persons who placed the defendant at the home of the suspected shooter prior to the murder of her husband. This gave the detective some concern as to the true status of the defendant. As a consequence, shortly after the conclusion of the other interviews (at 10:45 A.M.) the detective re-interviewed the defendant, who had been waiting in the lobby although she was, and had remained, free to leave.
Early in this second interview the defendant confirmed to the detective that she had been at the house of the co-defendant-to-be and had "summoned him to come over there to do something." At this time the detective had the defendant read her rights out loud in the presence of another detective and himself. The defendant was then pre-interviewed, then her statement was tape recorded.
It would appear that a legally unremarkable series of events had taken place, i.e., a person not in custody was interviewed by the police, voluntarily gave a statement, was re-interviewed, warned as to her rights, and voluntarily gave a further (taped) statement. Such a series of events does not call for suppression of the statements. See Caso v. State, 524 So.2d 422 (Fla.1988)(police are required to give Miranda warnings only when the person is in custody), cert. denied, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988); State v. Polanco, 658 So.2d 1123 (Fla. 3d DCA 1995)(a suspect who responded to unwarned yet uncoercive questioning may yet waive his rights and confess after required Miranda warnings.) The trial court, however, concluded that the defendant was in police custody notwithstanding that she was at the police station as an apparent victim and witness to her husband's murder and notwithstanding that she was free to leave the police station at any time. As a consequence of the determination, the trial court concluded that the unwarned statements were not admissible and the warned statement was coerced, thus not admissible, and ordered the statements suppressed.
The appropriate test for determining whether a person is in custody and thus *377 must be given Miranda warnings is laid out in Stansbury v. California, 511 U.S. 318, 322-23, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 298 (1994):
"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but `the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' (citation omitted).
Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."
The suppression order reveals that the trial court erred in its analysis of the custody question by departing from the objective circumstances and basing its decision on the subjective view of the defendant. In doing so the trial court stated:
"One cannot examine the totality of the circumstances without also recalling that Ms. Gilles is a native of Haiti. Although she had resided in the United States for some time, her background would still be one which would be fearful of police authority and submissive to authority....
[T]his court finds that the lobby of the police station was not any different in the mind of Defendant Gilles than a holding cell would have been." [emphasis supplied]
R. 62-63.
As we have noted, the test to be applied to determine whether a person is in custody is an objective one. The interviewee's own set of apprehensions or mental state, unless visited upon her or him by the interrogator, does not require suppression. See Johnson v. State, 696 So.2d 326 (Fla. 1997). Here, the detective did nothing other than his proper duty. That the defendant may have acted on her own fears and apprehensions was not a proper basis for suppression.
The tragedies in Haiti are not here ignored or attempted to be understated. Indeed, oppression and police brutality anywhere are anathema, but cannot be transported into the North Miami police station so as to render a custody issue into a personal view in each case. The police would soon be hamstrung from making inquiry of anyone until they had biographical background information indicating what type of behavior on the part of the police would cause the interviewee to have a level of apprehension that would equate to "custody." For example, the record here shows that the defendant had resided in the United States for twenty-eight years prior to the instant events and can speak, read, and understand English. The record is devoid of evidence as to the defendant's experience, if any, with the Haitian police of the 1960's, yet the trial court concluded that because of the defendant's background, she would be fearful of and submissive to authority. Such results would have to be anticipated by the police in each and every instance and their procedures tailored specifically to the individual interviewee, based on the police officer's understanding of the interviewee's past experience. The task would be impossible.
The order suppressing the defendant's statements is reversed.
NOTES
[1] The information refers to September 19, 1995. Testimony at the suppression hearing refers to August 19, 1995.