786 So.2d 606 (2001)
STATE of Florida, Appellant,
v.
Shawanta SCOTT, Appellee.
No. 5D00-2481.
District Court of Appeal of Florida, Fifth District.
April 12, 2001.
Rehearing Denied June 8, 2001.
Robert A. Butterworth, Attorney General, Tallahassee, and Tammy L. Jaques and Mary G. Jolley, Assistant Attorney General, Daytona Beach, for Appellant.
James B. Gibson, Public Defender, and Dee Ball, Assistant Public Defender, Daytona Beach, for Appellee.
PLEUS, J.
This case involves grand theft from a motel room. The State appeals the trial court's order which granted Shawanta Scott's motion to suppress on the ground that the investigating officer did not Mirandize[1] *607 Scott before her incriminating statements. This court has jurisdiction. The issue is preserved for review and the trial court's application of the law to the facts is reviewable de novo. We reverse.
Officer Charles Longson testified at the suppression hearing that he went to the Econo Lodge Central Motel on February 18, 2000 to investigate the theft, two days earlier, of a wallet and credit card from one of the motel rooms. Longson, dressed in plain clothes, first went to the front desk manager where he obtained a copy of the lock readout report showing who had been in the motel room that day. Scott had been assigned to clean the room that day. At Longson's request, the front desk manager asked Scott to come to the reception office to speak with Longson. The motel's reception office was furnished with two desks and a door open to the general public. When Scott arrived, Longson simply told her, in a normal conversational tone, that he was investigating a guest room theft and that she was one of three suspects. Jack Asbury, the hotel's General Manager, was also present during the tape recorded interview which lasted between 20 and 30 minutes. Longson was seated in a chair across the desk from Scott. Asbury was seated at the second desk. Longson told Scott it had been discovered that the credit card which had been taken from the room had been used in Lake Wales, and that three of the motel employees who had worked that day lived in Lake Wales.
Longson explained to Scott the lock readout report and the integrity of the locks and key control. She was told her key was the only one which had been used to enter the room that day. Scott then admitted to Longson that she was involved along with another female employee. There is nothing in the record to indicate that Longson coerced, threatened, intimidated or touched Scott in any way. He did not brandish his weapon. During the interview, she was slouched in her chair in a relaxed position. According to Longson, Scott was not happy about the incident, but she did not appear upset, scared or intimidated. Longson told Scott that he would follow up by sending the paperwork through the court. He did not arrest her that day. Longson asked Scott to get the other girl whom she had implicated. Scott then left and went home. Longson did not Mirandize Scott before or during the interview, and did not tell her she was free to leave during the interview. Scott testified that she did not feel that she was free to leave during her interview with Longson.
The sole issue in this case is whether Longson's interview with Scott was a custodial interrogation. Miranda warnings are required only during a custodial interrogation. See State v. Wilson, 747 So.2d 1051 (Fla. 5th DCA 2000). If a defendant is not in custody during questioning, they are not required. Id. at 1052. In Wilson, this court noted that a trial court's ruling as to whether a suspect is in custody when incriminating statements are made is entitled to great deference. It is only where the ruling is not supported by competent, substantial evidence that reversal is required.
In Ramirez v. State, 739 So.2d 568 (Fla. 1999), cert. den., 528 U.S. 1131, 120 S.Ct. 970, 145 L.Ed.2d 841 (2000), the supreme court enunciated the following guidelines for determining whether an interrogation is custodial:
... `Interrogation takes place ... when a person is subjected to express questions, or other words or actions, by a state agent, that a reasonable person *608 would conclude are designed to lead to an incriminating response.' ... [citation omitted].
Custody for purposes of Miranda encompasses not only formal arrest, but any restraint on freedom of movement of the degree associated with formal arrest. Arbelaez v. State, 626 So.2d 169, 175 (Fla.1993). A person is in custody if a reasonable person placed in the same position would believe that his or her freedom of actions was curtailed to a degree associated with actual arrest. See Traylor [v. State], 596 So.2d at 9[66] n. 16; Roman v. State, 475 So.2d 1228, 1231 (Fla.1985). `The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect's position would have perceived the situation.' Davis v. State, 698 So.2d 1182, 1188 (Fla.1997), cert. denied, 522 U.S. 1127, 118 S.Ct. 1076, 140 L.Ed.2d 134 (1998); see Roman, 475 So.2d at 1231.
The question of whether a suspect is in custody is a mixed question of law and fact. See Thompson v. Keohane, 516 U.S. 99, 106-07, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The four-factor test adopted by the Iowa Supreme Court provides guidance in making the determination whether a reasonable person in the suspect's position would consider himself in custody: (1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is free to leave the place of questioning. See State v. Countryman, 572 N.W.2d 553, 558 (Iowa 1997). Although not set forth as a `four-factor test,' our case law includes a consideration of these same factors. See Caso v. State, 524 So.2d 422, 424 (Fla. 1988); Roman, 475 So.2d at 1231; Drake v. State, 441 So.2d 1079, 1081 (Fla.1983).
Ramirez, 739 So.2d at 573-574. See Mansfield v. State, 758 So.2d 636 (Fla. 2000).
The state correctly contends that an "interviewee's own set of apprehensions or mental state, unless visited upon her or him by the interrogator, does not require suppression." State v. Gilles, 701 So.2d 375, 377 (Fla. 3d DCA 1997). The Gilles court cited to the supreme court's decision in Johnson v. State, 696 So.2d 326 (Fla. 1997), cert. den., 522 U.S. 1095, 118 S.Ct. 892, 139 L.Ed.2d 878 (1998) in which the court held that a confession will not be set aside where a suspect's delusion or confusion comes from his own apprehension, mental state or lack of factual knowledge rather than from his interrogators. Thus, the fact that Scott testified that she did not feel that she was free to leave the scene during her interview with Longson is not dispositive of this case.
The state relies upon two cases: State v. Wilson, 747 So.2d 1051 (Fla. 5th DCA 2000) and Ramsey v. State, 731 So.2d 79 (Fla. 3d DCA 1999). In Wilson, a burglary case, the investigating deputy testified at the suppression hearing that he had gone to Randy Wilson's home in Osceola County to investigate whether Wilson had tried to pawn a stolen fax machine in Tampa. The deputy stayed in the yard when Wilson came to the door. He told Wilson that he was investigating a burglary of a fax machine which had occurred in Orange County. The deputy suggested that they try to return the stolen property to the owner at which time Wilson gave him the location of several other items of stolen property. The deputy said he thought the owner just wanted his property back. Wilson responded by explaining how he had committed the burglary. The *609 deputy gave Wilson his business card and told him to call him to take care of the matter and then left.
This court found that these circumstances did not give rise to a finding that Wilson was in custody during the deputy's interrogation reasoning:
This testimony fails to reveal any fact that would lead to the conclusion that a reasonable person in Mr. Wilson's position would believe that he was in police custody at the time he made his inculpatory statements. No evidence was adduced indicating that, during his conversation with Mr. Wilson, the deputy used threatening or commanding language; brandished a weapon or made any threatening gestures; or that he touched or approached Mr. Wilson. Furthermore, the entire conversation occurred while Mr. Wilson was standing outside the front door of his house and the deputy was standing in the front yard. Since, at no time did the deputy do anything or say anything to indicate to Mr. Wilson that he was in police custody, Miranda warnings were not required. Accordingly, we must reverse the trial court's order suppressing Mr. Wilson's statements.
Wilson, 747 So.2d at 1052.
In Ramsey v. State, 731 So.2d 79 (Fla. 3d DCA 1999), a murder and robbery case, Kenya Ramsey and David Kerlin were employed at a bookstore. When the owner, Edward O'Connor, came into the store intoxicated to play video games, Kerlin gave Ramsey a bat to hit him so they could rob the store. Ramsey hit O'Connor on the back of the head twice and then he and Kerlin called 911. O'Connor was taken to the hospital where he later died. Once the doctors determined that O'Connor had been struck on the head, the death was investigated as a homicide. Ramsey and Kerlin spoke with the police voluntarily on several occasions explaining that they had found O'Connor on the floor in a pool of blood. Ramsey also said that he had seen a tall blond male leaving the store shortly before finding O'Connor. At one point, the police interviewed Ramsey and Kerlin separately. Kerlin admitted that Ramsey had hit O'Connor and taken his pouch at which point Kerlin was Mirandized and his statement was recorded. Not knowing that Kerlin had confessed, Agent Wiener, the officer interviewing Ramsey, suspecting that something was amiss, decided to bluff and tell Ramsey that Kerlin had confessed. Ramsey was evasive. Once Wiener discovered that Kerlin had in fact implicated Ramsey, he gave him some details of the confession. Ramsey then confessed after which he was Mirandized and his confession was recorded.
The Third District found that Ramsey was not in custody during Wiener's interrogation reasoning:
... During his interview, Ramsey was neither threatened or handcuffed and was given food and water. He was never told that he was not free to leave at any time....
* * *
It is absolutely undisputed in this case that up until the time that the police confronted Ramsey with the details of his co-defendant's statements implicating him, Ramsey was not in custody and was at the police station voluntarily speaking to the police without any coercion or intimidating circumstances....
As here, in the absence of any indicia of coercion or intimidating circumstances, police questioning about criminal conduct or activity alone, does not convert an otherwise consensual encounter into a custodial interrogation.... Here, the moment the police relayed the co-defendant's statements to Ramsey, *610 Ramsey spontaneously confessed. Because Ramsey was not subject to custodial interrogation at the time, the police were not required to Mirandize him....
Id. at 80-81.
We compare Wilson and Ramsey with Killian v. State, 761 So.2d 1210 (Fla. 2d DCA 2000), a case in which the court reversed the trial court's order denying the defendant's motion to suppress. In that case, a case involving capital sexual battery, handling and fondling a child, and use of a child in a sexual performance, Detective Daniel Curry testified at the suppression hearing that he and two other detectives and a crime scene technician went to Jack Killian's home to execute a search warrant of the residence. The events which followed are summarized in the court's discussion of those factors which led it to the conclusion that Killian was in custody for purposes of Miranda:
... It is not disputed that for at least the majority of the time that Killian was waiting under the tree, whether he was standing there by direction of the officers or on his own volition, either Detective Curry or another detective was keeping an eye on him. The reason given was officer safety. Whatever the reason, we do not believe that a reasonable person would believe he was free to leave the premises when he was being watched almost continuously. In light of the fact that the officers had a search warrant, we believe it is irrelevant whether Killian invited Detective Curry inside the house, because the detective was legally allowed to go inside the house regardless of an invitation to do so. Although the questioning of Killian by Detective Curry occurred in Killian's home, that home was being searched pursuant to a warrant by four other law enforcement officers. In finding that that environment of the conversation was hospitable, the trial court pointed out that Killian was `permitted' to drink a beer. Permission to drink a beer in one's own home is not necessary unless there is some restraint on one's freedom. Regardless of whether Killian sought permission to drink the beer, Detective Curry revealed in his testimony that he did not want to do anything to inhibit Killian from talking. If anything, drinking a beer would lessen Killian's inhibitions. Thus, we do not view Killian's drinking a beer as indicative of him not being in custody for Miranda purposes. Finally, it is clear from Detective Curry's testimony that Killian was confronted with the allegations of the child victim during the conversation, which lasted for between thirty minutes and two hours. It is undisputed that Killian was never informed that he was free to leave.
Id. at 1214. We also compare Wilson and Ramsey to Mansfield v. State, 758 So.2d 636 (Fla.2000). In Mansfield, the defendant was found to be in custody where he 1) was questioned by three detectives at the police station; 2) was never told he was free to leave; 3) was confronted with evidence strongly inferring his guilt; and 4) was asked questions which made it readily apparent that he was the primary, if not the only, suspect.
We conclude that the place and circumstances surrounding Longson's interview of Scott do not support the conclusion that Scott was in custody during their interview. Although Longson did not tell Scott she was free to leave, there is nothing to suggest that her freedom of movement was curtailed in any manner. As the court noted in Ramsey, "police questioning about criminal conduct or activity alone, does not convert an otherwise consensual encounter into a custodial interrogation." Ramsey, 731 So.2d at 81. The evidence in *611 this case establishes that Longson's interview of Scott was nothing more than a consensual encounter. The trial court's order suppressing Scott's statements is reversed.
REVERSED.
SHARP, W., and PALMER, JJ., concur.
NOTES
[1] See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).