WALLACE, Judge.
The State appeals the trial court’s order granting Angel Diane Shell’s motion to suppress statements she made to a law enforcement officer without the benefit of the Miranda[1] warning. Because we find that Ms. Shell was not in custody when she *630 made the statements, we reverse the order and remand for further proceedings.
BACKGROUND
Detective Brenda Kureth of the Collier County Sheriffs Office asked Ms. Shell to bring her two children to the Child Protection Team (CPT) Office in Naples so that a CPT caseworker could interview the children. The CPT caseworker was investigating allegations of abuse against the children by them father, who was Ms. Shell’s former husband. Ms. Shell, accompanied by her sister, brought the children to the CPT office as requested. Detective Ku-reth monitored the interview with the children while Ms. Shell and her sister waited in another room. During the interview with the children, their statements led Detective Kureth to believe that Ms. Shell had previously lied to her and to representatives of the Department of Children and Families (DCF) about where the children had been during the period of the alleged abuse. The detective asked Ms. Shell to give a taped statement. Ms. Shell agreed, and Detective Kureth directed Ms. Shell into a conference room and closed the door.[2]
Detective Kureth did not administer the Miranda warning to Ms. Shell before questioning her. The detective’s questioning of Ms. Shell lasted approximately five minutes. The transcript of the taped statement — double-spaced between each question and answer- — -is only four pages long. In response to Detective Kureth’s questions, Ms. Shell readily admitted to leaving the children with their father despite a standing no-contact order, to telling the children to lie to representatives of the DCF about their whereabouts, and to having lied when she told representatives of the DCF that the children were with her during the time that they were actually with their father. Although the DCF sheltered the children, Ms. Shell left the CPT office with her sister after answering Detective Kureth’s questions. The State subsequently charged Ms. Shell with child neglect, and she filed a motion to suppress her taped statement. Ms. Shell claimed that she had been in custody when she made the statement and that she did not receive the benefit of the required Miranda warning.
Detective Kureth was the only witness who testified at the hearing on Ms. Shell’s motion to suppress. At the conclusion of the hearing, the trial court granted the motion to suppress Ms. Shell’s statement. The trial court reasoned:
I noticed in particular she was asked very pointed questions which were ... directly on point to where her responses amounted to really a total confession.
And it appears that law enforcement was not just asking questions out of curiosity, law enforcement had some knowledge of what was going on and asked directly, did [you] do [ ] it and she said yes.
[[Image here]]
Well, you tell the mother of small children that you have to bring your children down here and it looks like the children aren’t going anywhere, there is certainly some coercive quality to that particular activity.
The purpose, place and the manner of the interrogation in a closed room with a police officer with a tape recording on, the extent to which the suspect was confronted with evidence of his or her *631 guilt, I don’t know that that was particularly an issue here.
And then the fourth one, the suspect is informed that he or she was free to leave the place of questioning. I would think that the ordinary citizen under these circumstances would certainly believe that they were in custody and not free to leave.
THE QUESTION OF CUSTODY
The determination of Ms. Shell’s motion to suppress hinged on the issue of whether she had been in custody while she was inside the closed conference room with Detective Kureth at the CPT office. It is custodial interrogation — -not mere questioning — that triggers Miranda’s requirement of the advisory warning that must be given to a suspect before questioning begins. In the Miranda opinion, the United States Supreme Court explained what it meant by custodial interrogation as follows:
[T]he prosecution may not use statements ... stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.
Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The test for determining whether a person “is in custody for purposes of Miranda” is “whether ‘a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest.’ ” Mansfield v. State, 758 So.2d 636, 644 (Fla.2000) (quoting Ramirez v. State, 739 So.2d 568, 573 (Fla.1999)). In applying this test, a trial court should consider four factors:
(1) [T]he manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Ramirez, 739 So.2d at 574. Here, consideration of the first and third factors showed little evidence of coercion, and the trial court focused on the manner of Detective Kureth’s interrogation of Ms. Shell and whether Ms. Shell was informed that she was free to leave the CPT office.
A. The Manner of the Interrogation
The trial court turned its attention first to the questions that Detective Kureth asked Ms. Shell about the discrepancies between what the children had said in their interview and what Ms. Shell had previously told the representatives of the DCF and the detective: “And it appears that law enforcement was not just asking questions out of curiosity, law enforcement had some knowledge of what was going on and asked directly, did [you] do [ ] it and she said yes.” According to the transcript of Ms. Shell’s taped statement, Detective Kureth asked:
D [Detective Kureth]: Okay. Um, and you let the [children] go visit the father regardless of the No Contact Order in place?
A [Ms. Shell]: Yes, m’am [sic],
D: The, recently you went to Tennessee.
A: Yes.
D: Okay. Was [J.] and, uh, [J.] with you?
A: No, m’am [sic].
*632 D: Okay. And however you did tell both [children] to lie and say that they were up there.
A: Xes, m’am [sic].
[[Image here]]
D: When Department of Children and Families Services called you on your cell phone while you were in Tennessee you said the [children] were fishing with their future step father, is that correct?
A: Yes, I did.
D: So you deliberately lied to-them and you deliberately lied to me.
A: Yes, m’am [sic].
D: And you told your [children] to lie.
A: Yes, m’am [sic].
D: Um, and you did allow these [children] to go visit their father knowing there was a No Contact Order in place.
A: Yes, m’am [sic].
We observe that the detective’s manner while asking these questions was halting and tentative. After reading the transcript, one is left with the impression that Detective Kureth was surprised by what she had recently learned from the children’s interview. In her questioning of Ms. Shell, the detective seemed to be searching for answers rather than making accusations.
“ ‘[I]n the absence of any indicia of coercion or intimidating circumstances, police questioning about criminal conduct or activity alone, does not convert an otherwise consensual encounter into a custodial interrogation.’ ” State v. Scott, 786 So.2d 606, 609 (Fla. 5th DCA 2001) (quoting Ramsey v. State, 731 So.2d 79, 81 (Fla. 3d DCA 1999)). In Scott, an officer interviewed a motel employee at the motel about the theft of a guest’s credit card. Id. at 607. The officer informed the employee that she was a suspect in the theft and tape-recorded the twenty- to thirty-minute interview in which the employee admitted being involved in the crime. Id. Although the officer did not tell the employee that “she was free to leave during the interview,” he did allow her to leave after the interview. Id. Because the officer did not inform the employee of her Miranda rights, the employee filed a motion to suppress her statements from the interview, and the trial court granted her motion. Id. at 606-07. The Fifth District reversed the trial court’s order, finding that the interview “was nothing more than a consensual encounter.” Id. at 611. The court, among other reasons, stated, “there is nothing in the record to indicate that [the officer] coerced, threatened, intimidated or touched [the employee] in any way.” Id. at 607.
In this case, the trial court’s concern about the content of the interview went to the question of whether Ms. Shell was interrogated, not whether she was in custody at the time. “ ‘Interrogation takes place ... when a person is subjected to express questions, or other words or actions, by a state agent, that a reasonable person would conclude are designed to lead to an incriminating response.’ ” Ramirez, 739 So.2d at 573 (alteration in original) (quoting Traylor v. State, 596 So.2d 957, 966 n. 17 (Fla.1992)). It is undisputed that Detective Kureth interrogated Ms. Shell. However, it is the manner of the interrogation — not the content — that determines whether the interrogation was custodial. Id. at 574. The record does not reflect that during , the interview, the detective was coercive, threatening, or intimidating. The trial court even recognized that “[t]he purpose, place and the manner of the interrogation” were not at issue.
The trial court’s second concern about the fact that the children were sheltered also touched on the manner of the interrogation. The trial court stated that sheltering the children has a “coercive quality.” *633 To be sure, the possibility that the children might be sheltered as a result of the entire encounter at the CPT office could add a coercive element to the circumstances of Ms. Shell’s interrogation. Nevertheless, our supreme court has acknowledged that “[ijn determining that a suspect was not in custody, it does not have to be found that the environment in which he was questioned was devoid of coercion.” Roman v. State, 475 So.2d 1228, 1232 (Fla.1985). The record does not reflect when the representatives of the DCF made the determination to shelter the children. Thus they could have made this decision before Ms. Shell arrived, during the children’s interview, or during or after Detective Ku-reth’s questioning of Ms. Shell. Although the record reflects that Ms. Shell knew she was bringing the children to be interviewed concerning the abuse allegations against their father, it does not indicate the extent of Ms. Shell’s knowledge at any point concerning whether her children would be sheltered.[3] The transcript of Detective Kureth’s questioning of Ms. Shell demonstrates that the detective did not mention that the children would be sheltered or use that possibility as a bargaining tool or threat. The fact that the children were ultimately sheltered did not make the manner of the interrogation coercive.
B. Whether Ms. Shell Was Informed She Was Free to Leave
Finally, the trial court commented on the fourth Ramirez factor: whether the person is informed that he or she is free to leave. One of the factors that determines whether a person is in custody for purposes of Miranda is whether a reasonable person in the suspect’s position would believe that his or her freedom “ ‘was curtailed to a degree associated with actual arrest.’ ” Mansfield, 758 So.2d at 644 (quoting Ramirez, 739 So.2d at 573). However, a suspect need not be advised that he or she is free to leave in order for the court to determine that the suspect was not in custody. Noe v. State, 586 So.2d 371, 373, 381 (Fla. 1st DCA 1991). The determination of whether a reasonable person would believe that his or her freedom is restrained is made by looking at the totality of the circumstances. Id. at 380-81.
In Noe, the investigating officers asked a mother and a father to come to the police station for questioning in connection with the death of their child. Id. at 373. The officers interviewed the mother for “less than two hours” with questions that “did not appear to be especially intimidating.” Id. at 381. No officer informed the mother that she was free to leave, and after approximately two hours, the mother confessed that she “ ‘snapped.’ ” Id. at 373-74. Later, the mother filed a motion to suppress her statement, claiming that she was in custody and had not received the Miranda warning. Id. at 373, 380. The First District affirmed the trial court’s denial of the mother’s motion, finding that “a reasonable person would not have considered the situation as being in custody.” Id. at 381. Because custody entails a limitation on freedom “to a degree associated with actual arrest,” given the totality of the circumstances, we conclude that a reasonable person in Ms. Shell’s position would not have considered herself in custody.
CONCLUSION
We may summarize by reviewing the Ramirez factors: Ms. Shell voluntarily *634 brought her children to be interviewed at the CPT Office. The trial court dismissed the second and third factors as not “particularly an issue here.” Detective Kureth did not tell Ms. Shell that she was free to leave; however, Ms. Shell was free to leave with her sister after the interview. Further, the interrogation lasted only five minutes and was not conducted in an intimidating manner. Thus we conclude that the totality of the circumstances indicates that Ms. Shell was not in custody during the interrogation. Accordingly, we reverse the trial court’s order granting Ms. Shell’s motion to suppress her statements, and we remand to the trial court for further proceedings.
Reversed and remanded.
WHATLEY and CASANUEVA, JJ., Concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Detective Kureth testified that she had closed the door to the conference room because the surrounding area was noisy.

. Although testimony from Ms. Shell might have shed light on this question, she did not take the witness stand at the hearing.