# SIXTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 6D23-520
Lower Tribunal No. CJ22-000471-XX

_____

STATE OF FLORIDA,

Appellant,

v.

S.G.,

Appellee.

_____

Appeal from the Circuit Court for Polk County.
Cassandra L. Denmark, Judge.

February 9, 2024

STARGEL, J.

The State of Florida appeals the trial court's May 27, 2022, Order on Motion to Suppress Statements entered in favor of Appellee, S.G., and petitions for a writ of certiorari quashing the trial court's June 2, 2022, Order on Child's Motion in Limine to Exclude Co-Conspirator Statements.[1] We have jurisdiction. *See* Fla. R. App. P. 9.145(c)(1)(B). Because we conclude the trial court erred in suppressing S.G.'s

---

[1] This case was transferred from the Second District Court of Appeal to this Court on January 1, 2023.

statements and in granting the Child's Motion in Limine to Exclude Co-Conspirator Statements, we reverse.

## Background

On March 16, 2022, a Polk County Sheriff's Office detective investigated an incident that occurred at a school after a student reported to school personnel that some students were making threats against other students. The reporting student said he had seen S.G., M.O., and L.S. talking together and could not say whether this had anything to do with the threats which he later learned about. The detective testified that although law enforcement received the report, they had not yet determined if a crime had been committed. Upon arrival at S.G.'s home, the detective met with S.G.'s parents outside their home near the garage. The detective was not in uniform but had her badge on a chain around her neck. The detective told S.G. and her parents that law enforcement had received information of a possible threat against other children at S.G.'s school and she thought S.G. might have some information. While speaking to S.G., the detective said something along the lines of "it's okay, sweetie, I'm just here to talk to you" and informed S.G. she was not in trouble. Because law enforcement had not established that any crime had been committed at that time, the detective did not tell S.G. that she was investigating her participation in a crime.

S.G. initially denied knowledge of any threats. When the detective asked S.G. if she had any text messages with someone named "M.O." on her phone, S.G. admitted she did. At the direction of her father, S.G. retrieved her phone from inside the house. S.G. opened the phone, looked at it, and said "this is embarrassing," before ultimately handing the phone to the detective. This occurred approximately fifteen minutes after the detective arrived at her house. S.G. explained that when M.O. texted her "who is first" and she replied "E.D.," that she was referencing an argument during after-care about boys, and that M.O. and E.D. had argued, so it was E.D. who they were going to talk with first the next day. S.G. told the detective that E.D. had bullied her. S.G. returned inside the house while the detective spoke with S.G.'s parents further about her concerns with that text message. S.G.'s father told the detective that it might be better if she spoke to S.G. alone. At that time, the only message the detective was aware of was M.O.'s text to S.G. "who is first" and S.G.'s reply "E.D."

Thereafter, the parents went inside and sent S.G. outside to speak with the detective alone. When S.G. returned outside, the detective told S.G. that she could tell S.G. was upset and that there was more to this. The detective inquired again about the message, and S.G. cried and admitted that she and M.O. had talked about killing E.D. and the text message was actually related to that topic. Approximately one hour after the detective arrived, she left S.G.'s home. The detective never told

S.G. that she was free to leave because S.G. was already home and freely coming and going between the house and garage. The detective did not confront S.G. with evidence, nor did she use threatening language. At no time was the detective asked to leave by S.G. or her parents. At this point, the detective was unaware of the content of all the text message conversations. Some of the messages had been deleted from S.G.'s phone, and other messages were sent in the group chat after the detective left.

S.G. became a suspect in the investigation after the detective spoke with M.O., and after the group text message continued. Evidence from another mobile phone in the investigation showed S.G. and other students making plans to harm another student. S.G. was taken into custody in the early morning hours of March 17, 2022, and on March 30, 2022, she was charged by delinquency petition with conspiracy to commit first-degree murder for the events that occurred on or about March 16, 2022.

## I.     **Motion to Suppress**

S.G. filed a motion to suppress the statements made to the detective on March 16, 2022. At the evidentiary hearing, the trial court heard testimony from the detective, S.G.'s mother and father, as well as a forensic psychologist, Dr. Randy Otto. Dr. Otto testified as an expert, and indicated he evaluated S.G. and found that

her ability to waive *Miranda*[2] rights voluntarily and knowingly would not be comparable to an adult making that decision, in part due to her being only thirteen years of age, and, in part due to deficits that he found pursuant to his evaluation. Dr. Otto opined that S.G.'s understanding of and ability to exercise her constitutional right to remain silent and avoid self-incrimination was limited at the time she was questioned by the detective, and that as a function of her age, she was more likely to comply with the requests and demands of a law enforcement officer than an adult. Dr. Otto did not, however, have any concerns regarding S.G.'s competence to proceed. Although S.G. does have an Individualized Education Plan at school, her challenges appear to be more with written language as opposed to audible language. S.G. has no intellectual disability, she is not on the autism spectrum, and she does not have ADHD. S.G.'s IQ screening test placed her in the average range of intelligence.

S.G.'s mother testified that she was not aware S.G. was the subject of a criminal investigation at the time the detective came to their home, and that if she had been aware, she would not have allowed S.G. to speak with the detective. S.G.'s

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966). Though the written motion to suppress alleges S.G.'s statements were obtained in violation of *Miranda*, at the hearing, S.G. did not per se contend that *Miranda* warnings were required. Instead, S.G. argued that Dr. Otto's testimony and other evidence must be considered by the trial court to determine whether S.G.'s statements were voluntary under the totality of the circumstances.

father testified that he allowed S.G. to speak with the detective because he was told she was not in trouble, and that the detective needed her help. He testified he was in the garage with S.G.'s mother, the detective, and S.G., and heard the initial conversation between the detective and S.G., and subsequently asked S.G. to go inside and get her phone. S.G.'s father testified that the detective informed him that this was her first stop and that she was going to speak to other children regarding the incident. The detective asked and was granted permission to take S.G.'s phone with her. S.G.'s father testified that the detective was not threatening or intimidating.

## Standard of Review

According to S.G., *Grasle v. State*, 779 So. 2d 334 (Fla. 2d DCA 2000), dictates the standard of review to be clearly erroneous. *Grasle* stated that "[a] trial court's ruling regarding the voluntariness of a confession is presumptively correct and should not be disturbed unless it is clearly erroneous." *Id.* at 336 (first citing *Escobar v. State*, 699 So. 2d 988, 993-94 (Fla. 1997); and then citing *Davis v. State*, 594 So. 2d 264, 266 (Fla. 1992)). However, *Connor v. State*, 803 So. 2d 598, 605-07 (Fla. 2001), abrogated *Escobar* and held that appellate review of trial court rulings on a motion to suppress would henceforth follow a two-tiered system of deference to factual findings and independent review of mixed questions of law and fact determining constitutional issues. Thus, we review a trial court's ruling on a motion to suppress as a mixed question of fact and law. *See id.* We defer to the trial court's

6

findings of fact if they are supported by competent, substantial evidence. *See Jackson v. State,* 18 So. 3d 1016, 1027 (Fla. 2009). "[T]he ultimate ruling must be subjected to de novo review[,] but the court's factual findings must be sustained if supported by competent substantial evidence." *C.A.M. v. State*, 819 So. 2d 802, 804 (Fla. 4th DCA 2001) (emphasis omitted) (quoting *State v. Glatzmayer*, 789 So. 2d 297, 301 n.7 (Fla.2001)). In other words, "[t]he determination of what statements were made is a matter of historical fact subject to a presumption of correctness," but "[w]hether the statements constitute coercion . . . is a matter of law reviewed de novo." *State v. Walter*, 970 So. 2d 848, 851 (Fla. 2d DCA 2007) (citations omitted).

## Analysis

The trial court granted the suppression motion based on its belief that the detective's statements amounted to an implied promise of leniency or coercion, citing to *Grasle* and *Ross v. State*, 386 So. 2d 1191 (Fla. 1980). The trial court stated:

> So that tells me everyone there felt as though she was given some type of leniency. She's not in trouble. "You're not in trouble" multiple times. That's where I had the issue and that's why I have to say that I'm going to have to suppress because she was under the impression that she was helping, that she was, you know, not going to be in any trouble.
>
> . . . .
>
> So I'm basing my decision based on that encounter that it could be perceived, even though there wasn't any coercion, it was in a different way. It was not [that] it was coerced where she came in with guns blazing. It was "sweetie." She made her feel more comfortable, is what

I'm trying to say, enough to talk to her. And that's where I had a problem.

A police officer can initially approach a suspect to collect information without rendering any admissions involuntary. *See Lukehart v. State*, 776 So. 2d 906, 917-20 (Fla. 2000). "[I]n the absence of any indicia of coercion or intimidating circumstances, police questioning about criminal conduct or activity alone, does not convert an otherwise consensual encounter into a custodial interrogation." *State v. Shell*, 932 So. 2d 628, 632 (Fla. 2d DCA 2006) (alteration in original) (quoting *State v. Scott*, 786 So. 2d 606, 609 (Fla. 5th DCA 2001)).

Here, the detective was investigating an incident that occurred at school and trying to determine if a crime had been committed. S.G. was not in custody, nor was she a suspect when the detective initially spoke to her; thus, *Miranda* warnings were not required. At that time, the detective was merely seeking more information and did not suspect that S.G. had committed a crime. Thus, S.G. was, in fact, not "in trouble" at that time. Advising S.G. that she was not "in trouble" and calling her "sweetie" did not amount to an implied promise of leniency or coercion. Based on the totality of circumstances, S.G.'s statements to the detective were made freely and voluntarily and should not have been suppressed.

## II.  Motion in Limine

The trial court conducted a hearing on the Child's Motion in Limine to Exclude Co-Conspirator Statements immediately after the suppression hearing. The

8

motion sought to exclude co-conspirator hearsay statements—some in the form of text messages in a group chat between S.G., M.O., and L.S. The exact content of those messages is not before this Court. On June 2, 2022, the trial court entered its order granting the motion and excluding the co-conspirator statements. In addition to the facts presented above, the following paragraphs include relevant testimony that was presented at the evidentiary hearing.

J.C. testified that he attends school with M.O., S.G., and L.S. but he only really knows M.O. On March 16, 2022, he saw M.O. talking with S.G. and L.S. Later, J.C. spoke with M.O. in the restroom and was scared and shocked about what he heard, so he told a teacher about the conversation. J.C. testified that when he spoke with M.O., whom he had known since pre-K, M.O. seemed "really different."

M.O. testified that he is friends with J.C. and has known him since pre-K. He also knows L.S. and considers her to be a friend but does not really know S.G. On March 16, 2022, he spoke with J.C. in the restroom, and J.C. asked what M.O. was talking to L.S. and S.G. about. M.O. explained that earlier he had been outside, and L.S. and S.G. came up to him to ask if he wanted to help them harm some girls. He did not recall whether it was L.S. or S.G. who asked him, but the three of them were present during this discussion. M.O. agreed to help harm E.D. and some other girls. The discussion lasted about ten minutes, and it continued when the three went into the media center. The conversation continued later in a group chat. During the

group chat, he discussed who the targets would be, including the order in which they would be harmed. M.O. testified that he called S.G. after he got home around 7:00 p.m. M.O. did not, however, testify about any statement made by S.G. during the group chat or phone call. On cross-examination, M.O. stated that he did not intend to hurt anyone.

The trial court ruled that, based upon the presentation of evidence at the hearing, proof of independent existence of a conspiracy needed to allow co-conspirator statements to be admitted was insufficient. The trial court was willing to reserve ruling until the evidence was presented at trial. The State, however, requested a final ruling on the motion in limine. The State explained that it planned to appeal the suppression ruling and wanted to appeal any adverse in limine ruling at the same time. The trial court determined there was no independent evidence of any statements made by S.G. Therefore, the trial court held that the evidence was insufficient to allow co-conspirator statements to be admitted.

**Standard of Review**

The State suggests that this Court review the Order on Child's Motion in Limine to Exclude Co-Conspirator Statements under the certiorari standard. However, we "may review interlocutory orders . . . to the extent provided by rules adopted by the supreme court." Art. V, § 4(b)(1), Fla. Const. In fact, "certiorari is an extraordinary remedy and [it] should not be used to circumvent

10

the interlocutory appeal rule which authorizes appeal from only a few types of non-final orders." *Belair v. Drew,* 770 So. 2d 1164, 1166 (Fla. 2000) (quoting *Martin-Johnson, Inc. v. Savage,* 509 So. 2d 1097, 1098 (Fla. 1987)).

Florida Rule of Appellate Procedure 9.145(c)(1)(B) authorizes the State to appeal an order "suppressing confessions, admissions, or evidence obtained by search or seizure before the adjudicatory hearing." "Appeal proceedings in juvenile delinquency cases shall be as in rule 9.140 except as modified by this rule." Fla. R. App. P. 9.145(a). In *State v. Palmore*, 495 So. 2d 1170, 1170–71 (Fla. 1986), the Florida Supreme Court, when analyzing Florida Rule of Appellate Procedure 9.140(c)(1)(B), agreed with the reasoning in *State v. Segura*, 378 So. 2d 1240, 1242 (Fla. 2d DCA 1979), which held that a "motion in limine was in effect a motion to suppress and subject to our review on appeal." Given that the pertinent language in rule 9.145(c)(1)(B) is identical to rule 9.140(c)(1)(B), it is reasonable to conclude "that the state has a statutory right to appeal in a case such as this."[3] *Palmore*, 495

---

[3] Without knowing the content of the order before the court, we recognize that the Fourth District has held, generally, that "[a]n order granting a defendant's pretrial motion in limine is not appealable under Florida Rule of Appellate Procedure 9.140, but the order is reviewable by common-law certiorari." *State v. D.H.*, 123 So. 3d 1175, 1175 (Fla. 4th DCA 2013). However, if the order under review stems from a motion to suppress, the Fourth District has held that jurisdiction lies pursuant to Rule 9.145(c)(1)(B). *See, e.g., State v. C.J.*, 219 So. 3d 974 (Fla. 4th DCA 2017). The Fifth District has interpreted *State v. Palmore* to hold that the content of the order, rather than its title, determines its appealability. *See State v. Katiba*, 502 So. 2d 1274, 1274 (Fla. 5th DCA 1987) ("Nevertheless, the state may appeal a pretrial order

11

So. 2d at 1171 (citing Art. V, § 4(b)(1), Fla. Const. and Fla. R. App. P. 9.140(c)(1)(B)).

The present appeal falls within the scope of rule 9.145(c)(1)(B). The motion in limine relates to admissions made by the co-conspirators, M.O. and L.S. The State retains the right to appeal said order even though it relates to statements made by a co-conspirator rather than S.G. because "[t]he term 'admission' in the rule is not limited specifically to those admissions made by the defendant himself. The term also encompasses statements made by someone acting in concert with the defendant such as a co-conspirator." *State v. Brea*, 530 So. 2d 924, 925 (Fla. 1988) (interpreting rule 9.140(c)(1)(B)). Accordingly, we treat the State's petition for writ of certiorari as an interlocutory appeal pursuant to Florida Rule of Appellate Procedure 9.145(c)(1)(B).[4]

## Analysis

In *Boyd v. State,* 389 So. 2d 642, 644 (Fla. 2d DCA 1980), the Second District Court of Appeal reiterated the general rule: "[W]hen a conspiracy is established, everything said, written, or done by any of the conspirators in execution or

---

granting a motion *in limine*, if it is an order '[s]uppressing before trial confessions, admissions or evidence obtained by search and seizure.' The caption of the motion giving rise to the order is not determinative of its appealability.") (internal citations omitted).

[4] "If a party seeks an improper remedy, the cause shall be treated as if the proper remedy had been sought; provided that it shall not be responsibility of the court to seek the proper remedy." Fla. R. App. P. 9.040(c).

furtherance of the common purpose is deemed to have been said, done, or written by every one of them and may be proved against each." (citing *Brown v. State,* 175 So. 515 (Fla. 1937)).

> While it is true that a hearsay statement of a defendant's alleged coconspirator is admissible against the defendant if the statement is made during the pendency of the conspiracy and in furtherance of its objectives, such testimony of hearsay statements is admissible only if the conspiracy itself has been established by independent evidence, i.e., not adduced from the hearsay testimony.

*Briklod v. State*, 365 So. 2d 1023, 1026 (Fla. 1978). "The requirement of independent evidence is a condition of admissibility." *Boyd*, 389 So. 2d at 644.

Pursuant to section 90.803(18)(e), Florida Statutes (2022), prior to admitting a co-conspirator's statement, "the State must show that a conspiracy existed, that the declarant and the party against whom the statement is offered were members of the conspiracy, and that the statement was made during the course and in furtherance of the conspiracy." *Brown v. State*, 359 So. 3d 408, 412 (Fla. 1st DCA 2023) (citing *State v. Edwards*, 536 So. 2d 288, 292 (Fla. 1st DCA 1988)). "A conspiracy is an express or implied agreement or understanding between two or more persons to commit a criminal offense." *Brown v. State*, 967 So. 2d 440, 444 (Fla. 4th DCA 2007) (quoting *Sheriff v. State*, 780 So. 2d 920, 922 (Fla. 4th DCA 2001)). "In determining the existence of a conspiracy, a court must rely upon evidence independent of the hearsay statements to prove the conspiracy before the coconspirator's hearsay statements are admissible." *Foster v. State*, 679 So. 2d 747,

753 (Fla. 1996). "[W]hen preliminary facts are disputed, the offering party must prove them by a 'preponderance of the evidence.'" *Romani v. State*, 542 So. 2d 984, 985 n.3 (Fla. 1989) (quoting *Romani v. State*, 528 So. 2d 15, 20 (Fla. 3d DCA 1988)).

Here, the trial court found that the State failed to prove the existence of the conspiracy by independent evidence because the witnesses could not testify to any statement made by S.G. The State, however, was deprived of the opportunity to present S.G.'s statements because the trial court had suppressed them. The suppressed statements included S.G.'s admission to the detective that she, M.O., and L.S. discussed killing E.D. Thus, the trial court's erroneous ruling on the motion to suppress permeated into its ruling on the motion in limine, which made that ruling erroneous too. On remand, the State may present S.G.'s statements at a new hearing on the motion in limine.

### Conclusion

We therefore reverse the trial court's Order on Motion to Suppress Statements as well as the Order on Child's Motion in Limine to Exclude Co-Conspirator Statements and remand to the trial court for further proceedings consistent with this opinion.

REVERSED and REMANDED.

NARDELLA and WHITE, JJ., concur.

14

Ashley Moody, Attorney General, Tallahassee, and Linsey Sims-Bohnenstiehl, Assistant Attorney General, Tampa, for Appellant.

Lily M. McCarty, of Todd Foster Law Group, Tampa, and Maria Pavlidis, of Pavlidis Law, LLC, Tampa, for Appellee.

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING
AND DISPOSITION THEREOF IF FILED